[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 52 
This proceeding is nominally, and in form, to collect from the city of Troy a claim of twenty-four dollars, alleged to be due to the relators, but really to test the validity of the "act to establish the Rensselaer police district, and to provide for the government thereof" (ch. 638 of the Laws of 1873). As the public were largely interested in the speedy settlement of the question, and important interests *Page 54 
would be likely to suffer and serious embarrassments arise by awaiting the ordinary process of quo warranto to try the title of the contestants for the office of police commissioner, whether of the city of Troy or of the proposed district, which is the precise point in issue, the intelligent counsel who represent the litigants doubtless advised this procedure, and have presented no other question upon this appeal, or upon the record before us.
The claim of the respondents is that the individuals assuming to act as police commissioners of Troy, and by whom, in the discharge of the duties of that office, the debt to the relators was contracted, were superseded by the appointment of police commissioners and their organization as a board of police, under the act establishing the Rensselaer police district.
Certain leading principles, entering into the consideration of the question presented, are so well settled and have been so often reiterated in different forms, that they scarcely require repetition now, and need not be elaborated.
1. Great respect is due to the intelligent and deliberate judgment of the legislature as to the constitutionality of a law, and no statute should be lightly or inconsiderately adjudged to be in contravention of the Constitution. A law which has received the sanction of the legislature and the approval of the executive should only be held void, as repugnant to the Constitution, when the repugnancy is clearly demonstrated. (People v. Briggs,50 N Y, 553; Adams v. Howe, 14 Mass., 340.) There should be no reasonable doubt of the unconstitutionality of a statute, before it should be annulled by judicial action. (People v.Supervisors of Orange, 17 N.Y., 235; Ex parte McCollum, 1 Cowen, 550.)
2. Courts do not sit in review of the discretion of the legislature, or determine upon the expediency, wisdom or propriety of legislative action in matters within the power of the legislature. Every intendment is in favor of the validity of statutes; and no motive, purpose or intent can be imputed *Page 55 
to the legislature, in the enactment of a law, other than such as are apparent upon the face, and to be gathered from the terms of the law itself.
3. A written Constitution must be interpreted and effect given to it as the paramount law of the land, equally obligatory upon the legislature as upon other departments of government and individual citizens, according to its spirit and the intent of its framers, as indicated by its terms. An act violating the true intent and meaning of the instrument, although not within the letter, is as much within the purview and effect of a prohibition as if within the strict letter; and an act in evasion of the terms of the Constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purpose, is as clearly void as if in express terms forbidden. A thing within the intent of a Constitution or statutory enactment is, for all purposes, to be regarded as within the words and terms of the law. A written Constitution would be of little avail as a practical and useful restraint upon the different departments of government, if a literal reading only was to be given it, to the exclusion of all necessary implication, and the clear intent ignored, and slight evasions or acts, palpably in evasion of its spirit, should be sustained as not repugnant to it. The restraints of the Constitution upon the several departments, among which the various powers of government are distributed, cannot be lessened or diminished by inference and implication; and usurpations of power, or the exercise of power in disregard of the express provision or plain intent of the instrument, as necessarily implied from all its terms, cannot be sustained under the pretence of a liberal or enlightened interpretation, or in deference to the judgment of the legislature, or some supposed necessity, the result of a changed condition of affairs. (1 Kent's Com., 162; Barto v. Himrod, 4 Seld., 483; Taylor v. Porter, 4 Hill, 144; Warner v.People, 2 Den., 272; People v. N.Y.C.R.R. Co.,24 N.Y., 485; Schenectady Observatory v. Allen, 42 id., 404.) *Page 56 
The same rules govern the interpretation of ordinary legislative enactments.
It is not, in general, a true line of construction to decide according to the strict letter of an act of parliament, but the courts will rather consider what is the fair meaning, and will expound it differently from the letter to preserve the intent. (Broom's Leg. Max., 657, et seq.)
With these general rules in view must this statute be judged when brought to the test of the Constitution, subject to this qualification, that if capable of two interpretations, that shall be given it, if possible, which shall make it consistent with the Constitution, rather than that which will bring it in conflict with it; ut res magis valeat quam pereat.
The purpose and object of section 2 of article 10 of the Constitution, as is very obvious, was to secure to the several recognized civil and political divisions of the State the right of local self-government, by requiring that all county, city, town and village officers, whose election or appointment was not provided for by the Constitution, save those whose offices might thereafter be created by law, should be elected by the electors of the respective municipalities, or appointed by such authorities thereof as the legislature should designate. As to offices known and in existence at the time of the adoption of the Constitution, this provision is absolute in its prohibition of an appointment by the central government or its authority, or by any body other than the local electors, or some local authority designated by law. Faithfully observed, and effect given to it in its spirit as well as in its letter, it effectually secures to each of the governmental divisions of the State the right of choosing or appointing its own local officers, without let or hindrance from the State government, and none can be deprived of the rights and franchises thus guaranteed to all. The theory of the Constitution is, that the several counties, cities, towns and villages are, of right, entitled to choose whom they will have to rule over them; and that this right cannot be taken from them and the electors and inhabitants disfranchised by any act of the legislature, *Page 57 
or of any or all the departments of the State government combined.
This right of self-government lies at the foundation of our institutions, and cannot be disturbed or interfered with, even in respect to the smallest of the divisions into which the State is divided for governmental purposes, without weakening the entire foundation; and hence it is a right not only to be carefully guarded by every department of the government, but every infraction or evasion of it to be promptly met and condemned; especially by the courts, when such acts become the subject of judicial investigation.
The act professes to establish a new civil division of the State under the name of the "Rensselaer police district," and its general purpose and object was to provide for the organization and government of a police force for that district, with courts of criminal jurisdiction in connection with the police organization, and as a part of an entire scheme. The whole duty of the commissioners related to the organization and government of the police force; and if, for any reason, the police force and the police magistrates could not be appointed as required by the terms of the act, the whole scheme fails, and the appointment of the commissioners under the act was a nullity. (Per Judge DENIO,People v. Draper, 26 N.Y., 540.) It is not denied that, at the time of the adoption of the Constitution, there were officers performing the same duties within the city of Troy as, by the act of 1873, are devolved upon the police force and magistrates of the proposed district. Whether they had at all times from the incorporation of the city, in 1816, been designated by the same name is not material; their duties were identical. The Constitution cannot be evaded by a change in the name of an office, nor can an office be divided and the duties assigned to two or more officers under different names, and the appointment to the offices made in any manner except as authorized by the Constitution; and courts will scrutinize acts of the legislature and see that the Constitution is not evaded and its intent frustrated by a mere colorable change in the designation *Page 58 
and title or the duties of an officer, when the appointment is taken from the locality, and will hold the act void unless the change is real and substantial. (Warner v. People, 2 Den., 272; Ex parte McCollum, 1 Cow., 550.)
The proposed district is constituted by annexing to or uniting with the city of Troy three small patches of territory — one on the east, a part of the town of Brunswick, principally, as is stated in one of the affidavits, agricultural lands, and containing in all between 500 and 600 acres of land, and on which there is, by count, sixty-nine dwelling-houses of all descriptions; one on the south, a part of the town of North Greenbush, containing about four acres of land, with a single dwelling-house thereon, and projecting, as annexed, in a triangular shape from the southern boundary of the city; and on the west a small island in the Hudson river, and within the bounds of Albany county, containing about a dozen acres of land, having thereon one foundry, or manufactory of machinery and engines, and a row of tenant-houses, with ten front doors, calculated for twenty families. The entire territory was less than a mile square in extent, but no part of it was within the boundaries of an incorporated city or village, or had ever had or required, so far as appears, any police organization or force, other than such as is common to every town in the State.
It is possible that these tracts adjacent to the city of Troy, and in many ways connected with it by the business relations and associations of the dwellers therein, might very properly be incorporated into and made a part of the city of Troy, by the enlargement of its boundaries so as to embrace the entire territory. There is certainly no impediment to such an extension of the city limits, and perhaps there may be a necessity for it. In substance and effect, the act does enlarge the boundaries of the city for certain purposes, while, for all other purposes, the former city and town organizations and relations are suffered to remain intact. That this is so, and that, instead of providing for the organization of a new civil division, the different portions of *Page 59 
which have a common interest, and are so situated as to demand a common defensive and protective force, and which it is impossible or impracticable to bring under one government, for all purposes, the act has for its chief and main object the establishment of a police force, under a new organization, for the city of Troy, and that the other fragments of territory were included merely to give the territory the name and form of a police district, as distinct from the ordinary civil division of the State, and not to give them any substantial or necessary benefit of a police, will be readily seen by a brief reference to some of the prominent and most important parts of the act itself.
There is scarcely an allusion to the distinct parts of the territory included within the proposed district, other than the city of Troy, in the whole act, except as the boundaries are prescribed in the first section.
By section 10 of the act, the magistrate to be appointed has jurisdiction of complaints for a violation of the ordinances of the city of Troy, and by section 16 he is required to hold his court within the city of Troy, and not elsewhere, and the common council of that city is required to provide, fit up and furnish suitable rooms, within the city, for holding such courts, and to supply the same with fuel, lights and stationery, and the expenses are to be paid by the city.
Section 18 repeals all laws relating to the appointment and election or designation of a police justice or magistrate for the city, and takes from such justices and magistrates all power and jurisdiction in all criminal matters and proceedings. Section 22 is very far-reaching, and gives the members of the police force all the common-law and statutory powers of constables in every part of the State, and, in terms, authorizes them to execute, in any part of the State, any warrant for search or arrest issued by any magistrate of the State, without any indorsement and according to the terms thereof.
Section 24 limits the quota of patrolmen to sixty-six for the city, and directs that their services be paid for by the *Page 60 
city; and by section 27 special patrolmen may be appointed during any election in the city of Troy, whose services are to be paid from the contributions of the city to the police fund.
Section 33 confers on the board of police power to require the service of the militia and of the civil authorities to quell riots, etc.; and, in the city of Troy, such power is conferred, to the exclusion of the mayor of the city and sheriff of the county, from whom all power in this respect is taken. The board has, by section 51, the power, and it is made its duty, to detail two patrolmen to each election district, and to appoint all poll and registry clerks, and to provide ballot-boxes for use at all elections in the city; and by section 52 the board is to select and provide suitable polling places for every election in the city, and supervise and control the arrangements for voting, challenging and canvassing votes, and directs the expenses to be charged upon the city.
Section 56 makes it the duty of the city to provide station-houses and keep the same in repair; and section 57 authorizes the board of commissioners to make an annual estimate for expenses in criminal proceedings, and for the purchase of land and for office accommodations, printing, stationery, badges and various other matters, and deliver the same to the mayor or chamberlain of the city, and makes the same binding on the city; and section 58 requires the amount to be levied by the city; and section 59 requires payments to be made monthly by the city chamberlain to the treasurer of the police board, such sum as the board shall require.
The board of police is made by section 73 to supersede the board of health of the city, and the police force of the city is abolished and superseded. There are other provisions of the act conferring great power, and devolving responsible duties upon the police organization under the act, by which the constables and sheriff of the county of Rensselaer are shorn of many of their functions and deprived of the emoluments of their office, which need not be particularly referred to. No one can read the act without being convinced that *Page 61 
the city of Troy was its objective point, and that its sole purpose and its sole effect is to provide a substitute for the police organization of that city, and to confer upon persons, to be appointed other than by the electors or some authority of the city, the duties and emoluments of office before then exercised and enjoyed by city officials and by officers of the county of Rensselaer.
There is an absence of evidence, in any provision in the act, of any necessity or supposed necessity for all or any part of the complicated machinery brought into existence by it to preserve the peace, to arrest offenders, execute criminal process, watch over the safety of the inhabitants, patrol the district, or perform the duties of a board of health in any part of the proposed district other than the city of Troy; or that the performance of those duties or any of the ordinary police duties in either or all the tracts of land outside the city of Troy, included within the district, was in the minds of the legislators, in the enactment of the law. The entire scheme was intended for the city of Troy, and, so far as it contemplates the creation and maintenance of a city police and a corps of patrolmen, it was adapted to the wants of a city; but to the isolated house in North Greenbush, the small island of a dozen acres with its single manufactory and its one block of tenement-houses, and the land in Brunswick with its sixty-nine scattered dwellings, it was entirely uncalled for and unsuitable. They are left still, for all purposes, a part of their respective towns and town organizations. As before said, the act operated practically only to enlarge the boundaries of the city of Troy for the purposes of a police organization, and adjacent territory was brought within the jurisdiction of the city police.
But if the act had taken the form which its substantive purpose justified, the legislature could not have taken from the electors and authorities of the city the election or appointment of the force. It is worthy of observation that, while the city of Troy is solely under the police board and the officers whose appointment is authorized by the act, the *Page 62 
other districts or patches of territory included are left in the possession of all the rights and privileges of the towns of which they are a part. No one privilege or franchise is taken from them. They are in truth merely ornamental appendages. But the substance and effect of the act and its true character do not depend upon its title, or the peculiar form given to it by its authors. The form and name cannot change the substance; and it must be judged by the substantial and effective provisions, and, judged by them, the act does not create for any purpose a new civil division of the State, and new offices for such district which may be filled as the legislature may direct.
It is left very doubtful, from the terms of the act, whether, in truth, any police duty proper was to be performed in any part of the added territory. The patrolmen and the organization for the city of Troy are carefully prescribed, but no thought is taken of the other parts of the district, and the utmost that was contemplated, probably, was that, in the formation of the precincts, the rural or foreign territory should be nominally included within some of the precincts of the city, and this would doubtless suffice for all the necessities of these additions.
This act differs from every other act in this very noticeable and important particular, — that all the territory embraced within the proposed district could, without interfering with any other political or civil division of the State, and without inconvenience to the inhabitants, have been brought within the bounds of the city, and incorporated in it in the performance of the duty specially enjoined by the Constitution upon the legislature, to provide for the organization of cities and villages. (Const., art. 8, § 9.) Other acts, for the creation of civil divisions for political purposes, have only been sustained after a struggle and much hesitation, and by reason of a supposed necessity, and because, on account of the extent of the territory united, and its relation to the State, and the recognized political organization of the State, it was not competent to readjust the municipal and local governments *Page 63 
and incorporate the whole territory under a single city government. It is conceded by all that these new civil divisions are a recent device, and were not and could not have been in the minds of the framers of the Constitution; and, in the absence of an actual and evident necessity, they must, within every principle of interpretation, be held to be forbidden. The Constitution has provided for, or in terms recognizes, every civil and political organization into which it was intended the State should be divided. It provides for senate and assembly and judicial districts, and the organization of cities and villages, and recognizes the ancient and well-known division of counties and towns; and, if any other division or organization is allowable, it can only be when neither of the others will serve or answer the purpose, or the objects cannot be accomplished by organizing the territory in view under one or the other forms of municipal government authorized by the Constitution.
If the legislature had had before it the map of the entire district, as we have, with its relation to the city of Troy, it cannot be doubted that, instead of the present act, the boundaries of the city would have been enlarged.
The police powers are among the most important of those conferred upon city governments, and, therefore, when the only object is to give the benefits of a city police to an inconsiderable strip of territory contiguous to a city, there is no necessity for a new civil division of the State; and when, as in this case, the absence of all occasion for the exercise of this doubtful power is apparent, the courts do not, in annulling the act, sit in judgment upon the motives or the discretion of the legislature. The power depends upon necessity; and, there being no necessity, there was no occasion for the exercise of legislative discretion. The necessity of departing from the Constitution can only exist when the same thing cannot be accomplished under the Constitution.
It was sought to bring the case within the principles ofPeople v. Draper (15 N.Y., 532); but it comes far short of it in every important element, and is not within the reasoning *Page 64 
of the very able judge who gave the prevailing opinion in that case, and of whom it is, perhaps, not too much to say that but for his ability and influence the decision might possibly have been the other way. That decision has now stood so long judicially uncondemned, although never, I think, satisfactory to the public or the legal profession, that it might not be proper, under any circumstances, to review or overrule it; and it is to be hoped, in the interests of constitutional government by the people, that the occasion to reaffirm its doctrines may never arise. To my mind the dissenting opinion of Judge BROWN, concurred in by Judge COMSTOCK, presents unanswerable arguments why the decision should have been different. The Constitution, in providing for a State government in all its parts and for the entire territory, distributing its powers among the various departments and organizing and authorizing the creation and organization of local governments for the different parts of the State under the general division of counties, cities, villages and towns, and in such forms that every power of government necessary to be delegated to any locality may be delegated to and conferred upon one or other of the municipal governments thus authorized and recognized, would seem to exclude the idea of the creation of any new or other division for the exercise of political power, or any other or different local government, and by necessary implication prohibit it. People v. Draper fully recognizes the fact that the general political division of the State cannot be disturbed. The learned judge says: "The counties and cities must not only be preserved, but the legislature must do nothing respecting them which will render them less suitable for the purposes for which they are recognized and employed by the Constitution." While it is difficult to see precisely how a new local political division can be organized, embracing the whole or a part of different cities and counties, to which a part of the power, and especially the police power, conferred upon and exercised by those organizations is transferred, without impairing their usefulness and making them less suitable for all the purposes for which they are recognized and employed, *Page 65 
if the judge had added that neither should the legislature do anything to deprive the counties and cities, and their electors, of the right of local self-government and the substantial rights and franchises guaranteed by the Constitution, it would have been less objectionable. But, without further considering the question, which perhaps may be considered as definitely settled, it is enough to say that it is not decisive of this case. In that case the local character of the police of four entire counties was abolished, and the four counties brought together into one police district, with careful provisions securing the rights of each so far as practicable. Here the local character of the police is not abolished; it is rather intensified. In the case of Draper there was an effective police organized for four prominent and contiguous counties, all connected together by the relations and associations of business, and to some extent equally exposed, and needing a protection, as was supposed, of a common force; at least that was the apology for the act. Here, the police is for a single city, and there was no question of expediency to be determined by the legislature as to abolishing the local police of several counties or towns and establishing one body in their place, under one general control. The territory embraced in the metropolitan police district could not well have been brought together and united under one and the same municipal government, and hence there was occasion for the exercise of legislative discretion in the creation of a police district embracing all the counties, if such power existed under the Constitution under any circumstances.
The case of Draper was followed by People v. Shepard
(36 N Y, 285), involving the constitutionality of an act establishing a capital police district embracing parts of the counties of Albany and Rensselaer and the city of Schenectady, including the lines of the Central railroad between the cities of Albany and Schenectady. (Chap. 554 of Laws of 1865, as amended by chap. 483 of the Laws of 1866.) It was like the metropolitan police act in this, that it united several cities which could not well have been incorporated under one *Page 66 
city government. These acts were held valid upon the authority ofPeople v. Draper; and cities united by the line of a railroad were regarded by reason of such union, as contiguous in territory, and capable, within People v. Draper, of being legally united as a distinct political division of the State, for police purposes. This later decision, carried to its logical and legal results, would permit every city and village of the State to be governed by a police appointed, and by a power located, at the capital of the State and emanating from the central head of the State government, to the entire disfranchisement, to this extent, of the local electors and municipalities. If a connection consisting only of the lines of a railroad will serve to make the places along the lines and at the termini contiguous, the same result would follow from the existence of a canal, a river or common road, or any other visible or artificial line that may exist or be created or established for that purpose; and a "capital police" could be made to serve for every city and village in the State. It is true that the learned judge by whom the opinion was pronounced seems to have been of the opinion that contiguity of territory was not essential to the creation of a police district. There may be no positive express prohibition against constituting counties, cities, villages and towns of dissevered and disconnected territories, but it would be opposed to the evident spirit of the Constitution and to the policy of the State; and the same is true of any civil division of the State for political purposes, which the legislature may create. The very idea of a distinct civil and political division of a State, necessarily implies a part of the State set apart and separated from every other part for a special purpose, compact and united, and not separated and divided by intervening territory, and other divisions, under separate and distinct local organizations. But, in the suggestion of the learned judge that contiguity and unity of territory are not essential in any civil division of the State which the legislature may establish, either within the Constitution or outside of its special provisions, a very ready way is found for a legislative usurpation of the rights thought *Page 67 
to have been guaranteed by the Constitution to the electors and local authorities of the different municipal and local governments. If the suggestion is adopted and carried into effect, all the legislature would have to do would be to declare that two or more cities or villages, no matter how far separated by distance, should be united and constitute a single police district, with authority in the executive of the State, or any other power that should be designated, to appoint the police force and police magistrates, and that would be accomplished which is in terms prohibited by the Constitution, viz., the appointment of municipal officers other than by the electors, or some authority of the municipality. In other words, by providing for the appointment of officers for two local and municipal governments, as of cities or villages, in a way and by an authority other than as prescribed by the Constitution, in the same act and under color of establishing a new civil division of the State, the act would not be within the condemnation of the Constitution, as it would if the same power of appointment had been given in respect to the municipalities separately; and, it would be established that the legislature could do that indirectly which could not be done directly, and an act which would be invalid as to one city would be valid if made to apply to two cities. This doctrine cannot be upheld upon any principle.
As the capital police district was an experiment, and, as it resulted, a successful experiment upon the principles supposed to be established in People v. Draper, the act before us is an experiment, and in the direction of an encroachment upon the Constitution, an improvement upon both acts, and marks the progressive spirit of the day. The principle of contiguity and unity of territory is not violated in the establishment of the new district, but the difficulty lies in the other direction, that there has been, in fact, no substantial and effective incorporation of the whole or a part of different counties, towns or cities for the purposes indicated by the act, and, looking at the substance rather than the form of the legislation, the act cannot be sustained within the reasoning *Page 68 
of People v. Draper, which alone can be regarded as authority, and that only in cases falling directly within the principles actually decided. It cannot be extended to cases differing essentially from it. The experiment in the act before us was to see with how little disturbance of the political organizations of the towns adjacent to the city of Troy, or the change of boundary lines, a police district could be established which would abide the tests of the Constitution, and, as that is patent upon the face of the act, it cannot be sustained as a valid and effectual exercise of the power claimed to exist in the legislature, to constitute a single police district from the whole or a part of several distinct municipal organizations, each constituting a substantial part of the new district, and being within the necessities leading to its creation, and having the benefits of the new organization.
The act is clearly unconstitutional, and the order must be reversed, and the motion for mandamus granted.
All concur except FOLGER, J., who dissents upon the ground that the decisions in The People v. Draper and The People v.Shepard were authoritative upon the questions involved.
Order reversed, and ordered accordingly.