PEOPLE *ex rel.* POND *v.* BOARD OF SUP'RS OF MONROE COUNTY.

(*Supreme Court, Special Term, Monroe County.* August 5, 1892.)

1. CONSTITUTIONAL LAW — JUDICIAL POWERS — REVIEW OF LEGISLATIVE ACTS — MANDAMUS.

The action of the legislature of New York, in reorganizing the senate districts and allotting members of assembly to the several counties of the state, in accordance with Const. art. 3, §§ 4, 5, may be reviewed by the supreme court, on a motion for a *mandamus* to compel the board of supervisors of a county to divide the same into districts, in conformity with the provisions of the act.

2. ELECTIONS AND VOTERS—APPORTIONMENT OF DISTRICTS—ENUMERATION OF INHABITANTS.

Const. art. 3, § 4, provides for an enumeration of the inhabitants of the state under legislative direction, and that at the first session after the return of such enumeration the legislature shall so alter the senate districts that each shall contain as nearly as may be an equal number of inhabitants, excluding "persons of color not taxed." Upon the reorganization of such districts, at the next session after such an enumeration, (Ex. Sess. April 30, 1892,) the legislature failed to so exclude

"persons of color not taxed." *Held* that, because of such failure, the reorganization violated the constitutional provision, notwithstanding that the act authorizing such enumeration failed to provide for ascertaining the number of such persons, and that the return of such enumeration contained no information on the subject.

3. CIVIL RIGHTS—DISCRIMINATION AGAINST PERSONS OF COLOR NOT TAXED.

Const. N. Y. art. 3, § 4, providing that in reorganizing the senate districts therein "persons of color not taxed" shall be excluded from the enumeration of the inhabitants made for that purpose, does not conflict with Const. U. S., 14th Amend., prohibiting any state from abridging the privileges and immunities of citizens of the United States, or 15th Amend., providing that the right of such citizens to vote shall not be denied or abridged on account of color.

4. ELECTIONS AND VOTERS — APPORTIONMENT OF DISTRICTS — INEQUALITY OF POPULATION.

The New York legislature, (Ex. Sess. April 30, 1892,) in the alteration and reorganization of senate districts within the state, established 11 districts lying in one body in the country, and capable of almost any division, 6 of which, as so established, contained an average population of 205,624, and 5 an average of 168,879. In the county of New York the 9th and 10th districts as formed contained, respectively, 164,936 and 206,463, and the 11th, 12th, and 13th districts in said county, lying together, respectively contained 166,175, 105,720, and 241,138. Seven counties were given 17 senate districts, representing an average of 173,151, while the remainder of the state had 15, representing an average of 189,819. In apportioning members of assembly to Monroe county, with 181,230 inhabitants, three were allotted; to Albany county, with 156,748, four; to Dutchess, with 75,078, two; and to St. Lawrence, with 80,679, one. There were various other instances of unnecessary inequality in the divisions and allotments. *Held,* that such legislative action was void, as in violation of Const. N. Y. art. 3, § 4, providing that on such reorganization each senate district should contain, "as nearly as may be," an equal number of inhabitants, and of section 5, providing that the members of assembly should be apportioned among the several counties, "as nearly as may be," according to the number of their respective inhabitants.

Application by Charles F. Pond for a writ of *mandamus* to compel the board of supervisors of Monroe county to divide said county into assembly districts. Denied.

*C. D. Kiehel,* for relator.      *W. A. Sutherland,* for defendants.

RUMSEY, J. On the 30th of April, 1892, at an extraordinary session of the legislature called for that purpose, an act was passed to organize the senate districts and to apportion the members of assembly. By that act there were allotted to the county of Monroe three members of assembly. The act required that the board of supervisors of counties which were entitled to more than one member should meet on the third Tuesday of July, and divide their respective counties into as many assembly districts as they were entitled to. The supervisors of Monroe county met on that day, but refused to proceed under the act, alleging as a reason that it was not constitutional. Thereupon the relator moves for a writ of *mandamus* to compel them to act. It appears that the relator is a citizen of Rochester, Monroe county, and an elector thereof. It further appears that the city of Rochester, with a citizen population of 129,355, constitutes one assembly district, and that the remainder of the county, with a citizen population of 51,875, is divided into two districts, thus giving to 25,937 people in the towns the same representation in the assembly as is given to the entire population of the city. In this way the people of the city of Rochester, including the relator, are deprived of their proper representation in the assembly by the refusal of the supervisors to act as the bill directs. That a writ of *mandamus* is the proper remedy in such a case, and that the writ may be sued out at the relation of a citizen and elector, has so recently been decided by the highest court of this and other states that no discussion upon that point is necessary. *People* v. *Rice,* 129 N. Y. 461, 29 N. E. Rep. 358; *People* v. *Rice,* 129 N. Y. 449, 29 N. E. Rep. 355; *Giddings* v. *Blacker,* 52 N. W. Rep. 944, (Sup. Ct. Mich. July 23, 1892;) *People* v. *Halsey,* 37 N. Y. 344. The relator, therefore, is entitled to have the writ issue, unless the defendants have shown a good reason why it should be denied.

It seems to be forgotten sometimes that the supreme law of the state is the constitution, and that obedience to that instrument is obligatory, not only upon the courts and the legislature, but on all citizens and officials whatsoever. In yielding that obedience it is the duty of each officer of the state, when called upon by statute to do any act, to examine whether such statute is within the constitution. As is said by Judge Cooley: "Every official of every department may at any time, when a duty is to be performed, be required to pass upon a question of constitutional construction." Cooley, Const. Lim. 41. If any act of the legislature violates the constitution, it is a nullity, and as if it had never been. No rights can be acquired by it, and no duty imposed. *Bridge Co.* v. *Paige*, 83 N. Y. 178, 191; *Boston* v. *Cummins*, 16 Ga. 102; *Bailey* v. *Railroad Co.*, 4 Har. (Del.) 389; *Taylor* v. *Porter*, 4 Hill, 140. Boards of supervisors are quite as much bound to regard the constitution as are any other officials, and if a law, so called, seeks to compel them to do some act which the constitution does not authorize, it is their duty, like that of every other person, to obey the fundamental law, and pay no attention to the decree which violates it. It is quite true that they may refuse obedience to the statute at their peril, if disobedience is followed by a penalty, provided they are mistaken in their judgment and the statute is constitutional. But none the less they are bound to look first at the fundamental law made by the people, and give that their first and highest obedience, and, if any peril is involved, it is one of those things which is inherent in the holding of official position. Following this well-settled rule, it has recently been held by the court of appeals that no public officer can be compelled by *mandamus* to do any act which involves the violation of a constitutional provision or which the law does not require him to do. *People* v. *State Board of Canvassers*, 129 N. Y. 360, 370, *et seq.*, 29 N. E. Rep. 345; *Same* v. *Rice*, 129 N. Y. 391, 29 N. E. Rep. 355. Therefore the board of supervisors not only had the right, but it was their duty, if the act of apportionment was a violation of the constitution, to refuse to obey it; and, if they are right in that judgment, no *mandamus* can issue to compel them to do so. We are directly and necessarily brought, then, to an examination of the constitutionality of the apportionment act. That question, being necessarily involved in the case, is not to be evaded or declined.

But before proceeding to it, it is well to recall some rules which have been adopted by the courts for their guidance in the discussion of such questions. In the first place, it is settled that there can be no presumption that the legislature had any but public and proper motives in view in the passage of any act. The question of constitutionality is one solely of power in the legislature. Cooley, Const. Lim. 186. In the second place, no act of the legislature can be adjudged unconstitutional unless it is either expressly or by necessary implication in conflict with the fundamental law. *People* v. *Draper*, 15 N. Y. 532, 543; Cooley, Const. Lim. 168 *et seq.* Springing out of this rule is the further principle that, if there be any well-founded doubt whether the act be unconstitutional, such doubt should be resolved in favor of the law. *Ogden* v. *Saunders*, 12 Wheat. 213, 270; Cooley, Const. Lim. 182. But while these rules are well settled, and will always be followed, because they only are consistent with the respect which the courts must show to a co-ordinate power of the state, still it is also settled, as stated by Judge ALLEN, that an act violating the true intent and meaning of the instrument, and in evasion of its terms as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purpose, is as clearly void as if in express terms forbidden. *People* v. *Albertson*, 55 N. Y. 50, 55. It will not be denied that the power to change its own organization, and to create new units of representation, is not inherent in the legislature, and that it is one which that body could not exercise unless it had been granted by the constitution. Unlike most of the powers which are exercised by the legisla-

ture, it is not necessarily involved in the power to make laws. If the constitution did not give it, no legislature would presume to exert it. The composition of the legislature and the boundaries of the several districts are established in the first instance by the people in their constitution. When so established, they must continue as made, unless the people see fit to change them, or unless they authorize some one else to do it. The power, then, having its origin in the constitution, is limited by that instrument, and must be exercised in the manner therein prescribed. The general rule is that to the due execution of a power there must be a substantial compliance with every condition required to precede or accompany its exercise. *Allen* v. *De Witt*, 3 N. Y. 276, 278. Especially is this the case where the condition and limitation of the manner of executing a power are contained in the constitution. The fundamental law, it is said, is presumed to be, and indeed is, prepared with the very greatest deliberation, and adopted only after every opportunity for reflection upon the meaning of each word has been had by different legislatures and by the people at large. *People* v. *Wemple*, 125 N. Y. 485, 490, 26 N. E. Rep. 921. These limitations upon the manner of exercising the power cannot be deemed to be merely directory. It is absurd to suppose that the people have carefully prescribed the manner in which so important a duty shall be performed for no other purpose than to advise the legislature, and then have left that body to follow the directions or not at its pleasure. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is, says Judge Cooley, at least a strong presumption that the people designed it should be exercised in that time and mode only. Cooley, Const. Lim. 79, 81. Indeed, I am firmly persuaded that the principle which allows any provisions or limitations of the constitution to be construed as directory, and not as mandatory, is pernicious and dangerous, and such construction is not in accordance with the weight of authority in this state at least. *People* v. *Purdy*, 2 Hill, 31, 36, 37; *People* v. *Lawrence*, 36 Barb. 177, 185; *People* v. *Albertson*, 55 N. Y. 50, 55; Cooley, *supra*. In the case of *People* v. *Supervisors of Chenango*, 8 N. Y. 317, Judge WILLARD expressed the opinion that the requirement of the constitution that the yeas and nays upon the final passage of a bill shall be entered on the journal was directory; but that holding was purely *obiter*, because he had already held that, as matter of fact, they had been so taken and entered in the case in question, (Cooley, Const. Lim. 79,) and therefore the case is no authority on that point.

The constitution prescribes that an enumeration of the inhabitants of the state shall be taken, under the direction of the legislature, in the year 1855, and at the end of every 10 years thereafter, and that the senate districts shall be so altered by the legislature at the first session after the return of every enumeration that each senate district shall contain, as nearly as may be, an equal number of inhabitants, excluding aliens and persons of color not taxed. It is provided, further, in the next section, that the legislature, at the first session after the return of every enumeration, shall apportion the members of assembly among the several counties, as nearly as may be, according to the number of their respective inhabitants, excluding aliens. But each county shall be entitled to one member of assembly, whatever its population, except that Fulton and Hamilton constitute one county for this purpose. It is by virtue of this constitutional provision that the apportionment act was passed, and the objections to it, based upon these sections, are: (1) That the enumeration upon which it was based was taken in 1892, and not at a tenth year after 1855; (2) that the extraordinary session at which the act was passed was not the first session after the return of the enumeration, within the constitutional provision; (3) that the senate apportionment is unconstitutional because in estimating the number of inhabitants in the new senate districts persons of color not taxed were included; (4) that

both senate and assembly apportionments are unconstitutional because the senate districts are grossly unequal in number of inhabitants, and the members of assembly are not apportioned among the counties as nearly as may be according to the number of citizen inhabitants, but that command of the constitution is ignored.

I am quite clear that the census, for purposes of apportionment, cannot be taken until the time prescribed in the constitution has arrived. Whether, if not then taken, it may be taken at the earliest moment afterwards, and a valid apportionment may be based upon a census then made, might be doubtful if it were an original question. But I am of opinion that that question, as well as the question whether the apportionment may be made at an extraordinary session of the legislature, has been decided practically by courts of high authority, and therefore I shall not consider them. *Rumsey* v. *People*, 19 N. Y. 41, 45; *State* v. *Cunningham*, (Wis.) 51 N. W. Rep. 724, 740. It is quite clear that the constitutional census, as it may be called, furnishes the only information for the legislature to use in reorganizing the senate and assembly districts. *Rumsey* v. *People*, 19 N. Y. 41, 46; *Lanning* v. *Carpenter*, 20 N. Y. 447; *Opinions of the Justices*, 142 Mass. 607, 7 N. E. Rep. 35. The apportionment is a continuing process, beginning with the enumeration of voters, and ending with the division into districts. *Opinions of the Justices*, 142 Mass. 601, 605, 7 N. E. Rep. 35. Being one entire act, all parts of it are to be examined in construing it. The law directing the census upon which the apportionment was based makes no provision for ascertaining the number of persons of color not taxed, and there is not contained in the return to the legislature any information on that subject. That there are large numbers of such persons in the state who are citizens appears by the papers; and, if it did not so appear, I have no doubt that the court would be obliged to take judicial notice of so notorious a fact with regard to the population of the state. *Kernitz* v. *Long Island City*, (Sup.) 3 N. Y. Supp. 144; *Howard* v. *Moot*, 64 N. Y. 262; *Mayor, etc.*, v. *Sands*, 105 N. Y. 210, 11 N. E. Rep. 820. The number of such persons was not deducted from other citizens in reorganizing the senate districts. It is clear that the constitution requires that they shall be excluded. Such is not the rule in apportioning members of assembly. The people struck out the provision excluding persons of color not taxed from assembly representation in 1874, but they retained it as to senators. Why it was so retained does not appear, nor is it important. It is sufficient that they have so ordained. It has not been unusual that the senate or upper house of the legislature of a state should represent a different class of people than the other house. By the constitution of 1777 the members of assembly were apportioned upon the number of electors, and the senators upon the freeholders possessing freeholds of the value of £100 sterling. The idea was abandoned in 1821, and the representative population for senators and assemblymen remained the same until 1874, when the constitution as to members of assembly was amended so as to place persons of color not taxed among the assembly representative population, leaving the senate representative population untouched. It may be that the doing of this was an oversight, but that it was done, and that as the result of such action the apportionment of senators still is to be based upon the number of citizens, excluding persons of color not taxed, cannot be denied.

It is claimed by counsel for relator that this exclusion of persons of color is a violation of the fourteenth and fifteenth amendments to the constitution of the United States. As to the fifteenth amendment, it is sufficient to say that it protects alone the right to vote, which is not affected by the provision of the state constitution now in question. The fourteenth amendment prohibits the abridgment by any state of the privileges or immunities of citizens of the United States. The privileges thus protected are privileges of citizens of the United States as such, and not those which attach to the citizens of any

particular state. Any state may regulate the political rights of its own citizens, except as prohibited by the fifteenth amendment, but it cannot deprive the citizens of other states, who become its citizens, from sharing the rights which the like class of citizens enjoy under its government. Thus far, and no further, the states are controlled by the fourteenth amendment. *Slaughter-House Cases*, 16 Wall. 36; *Presser* v. *Illinois*, 116 U. S. 252, 6 Sup. Ct. Rep. 580. This direction of our constitution, then, is not prohibited by the national fundamental law. It is precise, clear, and positive. It leaves nothing to the discretion of the legislature. It is quite clear that it was ignored by the legislature in passing the enumeration law, and the apportionment act was based on the census taken under it. It was as clearly the duty of the legislature to give effect to this direction as to any other positive instruction of the people contained in the fundamental law. That body is quite as much bound by the constitution as any other collection of citizens. *People* v. *Albertson*, 55 N. Y. 50. It has no dispensing power. It is true that the people can impose no punishment on the legislature for disobedience, but the fact that one is only bound by his honor to obey the wishes of his superior furnishes not infrequently to honorable men the very strongest reason for implicit and careful compliance with such commands. This command was not obeyed, and I see no escape from the conclusion that the act in that regard violates the constitution.

The next objection taken to the act is that it violates that injunction of the constitution that the senate districts shall contain as nearly as may be an equal number of inhabitants, and that the assemblymen shall be apportioned among the several counties as nearly as may be according to the number of their respective inhabitants. The constitution prohibits the division of a county in the formation of a senate district, unless such county shall equitably be entitled to two or more senators, and requires that each county, however small its population, shall have at least one member of assembly, Fulton and Hamilton being rated as one county for that purpose. A statement of some of the inequalities will show how far they are due to a compliance with these provisions, which must necessarily prevent exact equality of population in the several districts. The representative population of the state, as shown by the return made to the legislature, is 5,790,865, so that the population of each of the 32 districts, if all could be equal, would be 180,899. The country districts contain the following population: 16th, 199,674; 17th, 176,341; 18th, 165,699; 19th, 156,748; 20th, 176,139; 21st, 229,005; 22d, 215,947; 23d, 196,481; 24th, 183,732; 25th, 201,017; 26th, 207,566; 27th, 169,499; 28th, 181,230; 29th, 185,922; 32d, 176,028. It will be noticed that the 21st to the 26th districts, inclusive, contain 1,233,748, or an average population of 205,624, being altogether 148,354 more than the ratio, while the 17th, 18th, 19th, 20th, and 27th contain 844,393, or an average population of 168,-879, and altogether 60,100 less than the ratio. Yet in these 11 districts are 40 counties lying in one body, and varying in population from 4,784 to 156,-748, so that almost any division would seem possible of them. In New York county, where the districts are divided by street lines, so that there is no difficulty in equalizing the numbers, the variation is still more remarkable. The 9th district has 164,936, and the 10th 206,463. The 11th, 12th, and 13th districts are carved out of the 19th and 22d wards, with part of the 12th and 23d wards, and they lie together. Yet the 11th contains 166,175, the 12th, 105,720, and the 13th, 241,138. Albany county, with 156,748 people, is made one district. Erie county, with 304,713, is made into two districts. If the proportion between city and country be taken, the result is still more strange and unjust. New York, Putnam, and Westchester are together formed into 9 districts, with an average population of 174,059, or 6,840 each less than the ratio; while the remainder of the state has 23 districts, with an average population of 183,666, or 2,767 each more than the ratio. If New

York alone had been divided into 8 districts, each would have had an average of 177,996, or each one 3,103 less than the ratio; leaving to the state at large 24 senators, or an average of 1 to 181,952, or 1,053 more than the ratio, which then would have given New York an advantage over the rest of the state. New York, Westchester, Putnam, Kings, and Richmond compose 14 districts, with an average population of 177,292, or each 3,607 less than the ratio, leaving the rest of the state with 18 senators, representing an average of 183,819, or 2,920 over the ratio. New York, Westchester, Putnam, Kings, Richmond, Albany, and Erie have 17 senators, representing an average of 173,151, or each 7,748 less than the ratio, while the remainder of the state has 15 senators, representing each 189,819, or an average of 8,920 each over the ratio. In the apportionment of assemblymen we see that Albany, with 156,748 people, has 4 members, while Monroe, with 181,230, has 3, which is the same number given to Rensselaer, with 121,679, and to Queens, with 123,974. Dutchess, with 75,078, has 2 members, while St. Lawrence, with 80,679, and Chautauqua, with 73,884, have each but 1.

The unnecessary inequality of much of this apportionment is quite manifest. For instance, if New York had been divided into eight districts, each would have had, as we have seen, an average population much nearer the true ratio than its districts now have. Albany, united with either Greene, Schoharie, or Schenectady, would have been much nearer the true ratio than now; while, if Niagara had been added to Erie, the two districts which might have been formed would have been quite near the true number. These suggestions are made simply to show that some of the inequalities of the senate districts are clearly unnecessary, and that the districts do not contain "as nearly as may be" an equal number of inhabitants. With regard to the apportionment of assemblymen among the counties mentioned above, the unnecessary inequality is clearly apparent. It needs no argument to show that the constitution means what it says when it requires that each district shall contain as nearly as may be an equal number of inhabitants, and that the members of assembly shall be apportioned among the counties as nearly as may be according to the number of inhabitants. Such provisions, or equivalent ones, are contained in the constitutions of a majority of the states and of the United States. It is the intention of the people that each person shall have as nearly as possible the same influence in the government as any other person, so that the representation of the constitution shall be of all the citizens equally. In the constitution of 1777 it was required that if upon the census it shall appear that the number of representatives in assembly from the counties is not justly proportioned to the number of electors in said counties, respectively, the legislature do adjust and apportion the same by that rule. In that constitution, as in each subsequent one, it was recognized that it was necessary that there should be a fair and just representation in the legislature of all those entitled to be represented there at all. I shall take no time to establish, what must be and is conceded, that the people intend that representation in senate and assembly shall be as nearly equal as possible. In the year 1885 an enumeration act was passed by the legislature, but vetoed by the governor. Since that time there have been constant complaints that the representation in either house of the legislature was not just or equal, and a continued demand that it be adjusted. These very complaints show the understanding of the people that representation in the legislature should be proportioned to numbers. They show, also, that the apportionment demanded is an equal and just one, based, as the constitution requires, upon the number of inhabitants, so far as may be, and not an arbitrary and unequal distribution.

But it is said that this matter is left to the discretion of the legislature, and that discretion cannot be reviewed by the courts. That some discretion in that regard is vested in the legislature cannot be denied, as it must have

been left in the nature of things.  But it is just as clear that the discretion is not absolute, because it is expressly directed that the apportionment should be equal, "as near as may be."  As is said by Judge SHEPLEY, (*Opinion of the Justices*, 18 Me. 472:)  "The very language limits, or more properly prohibits, any such discretion by declaring that the conformity shall be 'as near as may be;' that is, as near as it may be practicable to make them, having regard to the number of inhabitants.  The language must have been used to define the rule, not to permit a departure from it at discretion, however soundly and justly exercised it might be.  If there may be a sound and a just exercise of discretion, it cannot be overlooked that there may be an unsound and unjust exercise of it, if it be permitted at all in any other case than when it arises out of an absolute and moral necessity.  And between such a discretion and any other there is this great and favorable distinction:  It finds its own certain limit in the necessity which gave rise to it; and it can extend no further than that necessity requires that it should, and it is not, therefore, liable to be abused.  And this is the only discretion that can in this case be admitted."

There is a wide distinction between such a limited discretion and the absolute power in the legislature to do as it pleases.  It must be remembered that the making of an apportionment is not, like the passage of a law, a matter which is to be done or not, as the legislature sees fit.  It is an absolute duty imposed by the people, without a sanction, it is true, but none the less a duty.  The manner of performing this duty is also prescribed.  The provision of the constitution, as I have shown above, is mandatory, and not by way of advice or suggestion only.  The limited discretion to be exercised is not a mere arbitrary one, but one to be extended only as far as may be necessary.  When it appears, as it does here, that the narrow and limited discretion is departed from so widely that it cannot possibly be accounted for on the ground of necessity or even of convenience, then the conclusion is inevitable that no constitutional discretion has been used.  But the people have expressly required that the limit of necessity should be observed.  The power to apportion is limited by the conditions of the grant, and these conditions inhere in it.  When the legislature disregards them it goes beyond its constitutional power.  If the constitutional limit is overstepped, and the legislature enacts that which the people have forbidden, I see no reason why the courts should not take their stand at that point, and assert the supremacy of the fundamental law.  As is said by Judge ALLEN:  "Usurpation of power, or the exercise of power in disregard of the express provision or plain intent of the instrument, as necessarily implied from all its terms, cannot be sustained under the pretense of a liberal or enlightened interpretation, or in deference to the judgment of the legislature or some supposed necessity."  *People* v. *Albertson*, 55 N. Y. 50, 55.  It is well known that since 1845, not only in this state, but throughout the country, the tendency of the people has been to limit and confine the power and authority of the legislatures.  Whether this arises from a distrust which the people have for the members of their legislatures, as Mr. Bryce asserts, or from the jealousy of power which seems to be inherent in the people, it is not necessary to inquire.  Every one recognizes, too, a tendency in all legislatures to evade constitutional restrictions in every possible way.  It is fair to suppose that the people meant these restrictions to be effectual to control the acts of their lawmakers, and, as they can impose no punishment for their violation, there is no other sanction than for the courts to insist to the fullest reasonable extent upon their undoubted power to apply to every law the constitutional test, and insist that that instrument shall be obeyed.  This case seems to me one of those where that power of the court should be exercised.

The conclusion I have reached—that the action of the legislature in apportioning the senate districts and assemblymen is subject to review by the

courts—is sustained by many adjudged cases of high authority. *State* v. *Cunningham*, (Wis.) 51 N. W. Rep. 724, and cases cited on page 728; *Giddings* v. *Blacker*, 52 N. W. Rep. 944, (Sup. Ct. Mich., July 23, 1892;) *People* v. *Canaday*, 73 N. C. 198. In the first two cases last cited the flagrant and unnecessary inequality of the apportionment was conceded, and the serious question presented in each was whether the limited discretion reposed in the legislature was the subject of review in the courts. In each of those cases the decision of the court was unanimous, and the court declared the apportionment void, for the sole reason that it was manifestly and needlessly unfair and unequal. The constitutional provisions on the subject are in each of those states substantially the same as in New York, and the decisions are express authority upon the point. The length of this opinion, however, prevents extended quotations from them. There can be no doubt that the apportionment of several senate districts is so manifestly and flagrantly unequal as to amount to a clear violation of the constitutional requirement, as is also the undoubted disparity between the number of inhabitants in the country as distinguished from the city districts. It is clear, too, that the constitution was grossly disregarded by giving to Albany county one more member of assembly than is allotted to Monroe, with over 24,000 more inhabitants, as well as by allowing to Dutchess county, with 75,078 people, two members, and to St. Lawrence, with 80,679, only one. These are violations which are clearly utterly unnecessary, and because of them the act is void. The provisions of an act of this kind are so largely dependent upon each other that if part of them violate the constitution the whole act must be declared void. *State* v. *Cunningham, supra.*

For these reasons the motion for a *mandamus* is denied, with costs.