David O. Boehm, J.
This article 78 proceeding commenced by order to show cause is brought by the petitioners to set aside the appointment of one W. Michael Losinger as a Commissioner of Elections. Monroe County has two Election Commissioners, one Republican and one Democrat.
Petitioner Robert Northrup is the present Democratic-selected Commissioner of Elections and is serving and has for years served in that position. At the annual organizational meeting of the county Democratic committee, held April 12, 1976, Losinger and Northrup were each nominated as that party’s choice as Commissioner of Elections to be recommended to the County Legislature for appointment. Having received the greater number of votes, Losinger was thereafter certified, pursuant to section 31 of the Election Law, by Laurence Kirwan, the party chairman, to the Monroe County Legislature as a "fit and proper” person to be appointed Commission of Elections upon the expiration of Northrup’s term at the end of the year. The County Legislature rejected *257 the recommendation by a vote of 15:14. Thereupon, the minority members of the Legislature, as permitted by subdivision 1 of section 30 of the Election Law,* voted among themselves and appointed Losinger.
This action was then commenced by the petitioners to (1) declare the appointment of Losinger void; (2) declare the pertinent portion of subdivision 1 of section 30 of the Election Law unconstitutional; (3) enjoin the Monroe County Clerk from accepting for filing Losinger’s certificate of appointment; (4) enjoin the Monroe County Finance Department from paying Losinger’s salary; (5) direct Kirwan, as party chairman, to convene a new meeting of the committee for a new election to be held selecting a "fit and proper” person to be a Commissioner of Elections.
The parties have all appeared as above set forth. Although properly served as required by CPLR 1012 (subd [b]), the Attorney-General did not appear (see Executive Law, § 71).
The arguments submitted by the petitioners against the legality of the appointment of Losinger are essentially twofold.
The first is that the portion of subdivision 1 of section 30 of the Election Law under which Losinger was selected by the minority members of the County Legislature is unconstitutional as being in violation of article IX (§ 1, subd [b]) of the State Constitution which provides for representative home rule.
The second is that the notice of the annual Democratic county committee meeting was defective, the proxies were invalid and the entire selection process at the meeting was improper; accordingly, the result should be vacated and a new election held.
These objections will be taken up separately.
One court has already held the attacked portion of subdivision 1 of section 30 of the Election Law to be unconstitutional (Alvaro v Baar, 67 Misc 2d 489) because of its collision with article IX (§ 1, subd [b]) of the Constitution. This appears to be *258 the only case on the point since the enactment of the additional language of subdivision 1 of section 30 in 1971.
Because of this court’s respectful disagreement with the holding in the Alvaro case, it will be necessary to give somewhat greater discussion to the subject than might otherwise be warranted, including some elaboration of the legislative histories.
Article IX (§1, subd [b]) of the Constitution was derived from section 2 of former article X. It then read: "All county officers whose election or appointment if not provided for by this Constitution, shall be elected by the electors of the respective counties or appointed by the boards of supervisors, or other county authorities, as the Legislature shall direct. All city, town and village officers, whose election or appointment is not provided for by this Constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the Legislature shall designate for that purpose. All other officers, whose election or appointment is not provided for by this Constitution, and all officers, whose offices may hereafter be created by law, shall be elected by the people, or appointed as the Legislature may direct.”
In 1963 article IX was adopted to consolidate and simplify the provisions for home rule and local self-government (see Historical Note, McKinney’s Cons Laws of NY, Book 2, Constitution, art IX, p 507; NY Legis Doc, 1959, No. 58, pp 14-29; Home Rule: A Fresh Start, 14 Buffalo L Rev 484).
Not only were the article and section renumbered, but the language in the new article IX (§ 1, subd [b]) was changed to read as follows: "All officers of every local government whose election or appointment is not provided for by this constitution shall be elected by the people of the local government, or of some division thereof, or appointed by such officers of the local government as may be provided by law.”
As may be observed by a comparison of the language of section 2 of old article X with new article IX (§ 1, subd [b]) the words "appointed by such authorities thereof’ were dropped and substituted with new language "appointed by such officers of the local government”. The reference to "authorities” had existed for a long period of time and could, and probably would, have been retained if the drafters had not intended to effect a significant change. It may be argued, therefore, that the words "such officers of the local government as may be *259 provided by law” were intended to include a wider range of possibilities than the former "or other county authorities as the Legislature shall direct.”
Except for Alvaro v Baar (67 Misc 2d 489, supra) the cases cited by the parties were decided prior to 1963 when the change in the constitutional language was made. In view of the impact of the new wording, there is some justifiable doubt as to their application to the case at bar.
Petitioners rely very heavily, as did the court in the Alvaro case, on Rathbone v Wirth (150 NY 459) in support of their position that the appointment power cannot be vested in a minority of the County Legislature. In that case, a statutory scheme similar to the one in the attacked portion of subdivision 1 of section 30 of the Election Law was challenged which provided for the election of police commissioners by the members of the Common Council of Albany. Each member could vote for not more than two persons, and the four persons who received the most votes were selected as the police commissioners. To fill a vacancy, the members of the common council of the same political party as the police commissioner whose office had fallen vacant recommended a candidate to the Mayor, who made the appointment.
The Court of Appeals held that the State Legislature could not usurp local homerule power by permitting a minority of the common council to be on an equal footing with the majority. Local governmental power may only be vested, the court held, in the aggregate of the members who make up the local legislative body and therefore the body may legally act only by the majority of its members (see, also, People ex rel. Bolton v Albertson, 55 NY 50; People ex rel. Williamson v McKinney, 52 NY 374; but cf. People ex rel. Wood v Draper, 15 NY 532).
Since the Rathbone decision, the language construed by the Court of Appeals has been changed. It is certainly not as clear today as it was then that, vested with what might be regarded as enlarged discretion, the State Legislature could not, as it did in 1971 by subdivision 1 of section 30 of the Election Law, provide that local officers, i.e., members of the County Legislature who belong to the second largest political party, may appoint a commissioner of elections.
However, regardless of whether or not the language change in article IX (§1, subd [b]) authorizes such legislation, it is clear that section 8 of article II of the Constitution does.
*260 Section 8 of article II reads: "All laws creating, regulating or affecting boards or officers charged with the duty of registering voters, or of distributing ballots to voters, or of receiving, recording or counting votes at elections, shall secure equal representation of the two political parties which, at the general election next preceding that for which such boards or officers are to serve, cast the highest and the next highest number of votes. All such boards and officers shall be appointed or elected in such manner, and upon the nomination of such representatives of said parties respectively, as the legislature may direct.”
A comparison of section 1 of article IX with section 8 of article II of the Constitution makes it apparent that a particular and specific exception was carved out of local home rule requirements in the case of election commissioners. Whereas section 1 of article IX requires the appointment by such officers of local government "as may be provided by law”, section 8 of article II permits appointment "in such manner” as the Legislature may direct. The State Legislature is given far greater discretion to legislate the "manner” in which an election commissioner may be appointed than, as in the Rathbone case, police commissioners could there be appointed. Even in Rathbone, the Court of Appeals noted that under section 6 of article II the predecessor to section 8 of article II the manner of appointment of election officers represented the single instance in which the people of New York, through their Constitution, surrendered the power of the majority (Rathbone v Wirth, 150 NY 459, 475, supra).
However, in 1911, the Second Department in Kane v Gay-nor (144 App Div 196, affd on concurring opn of Burr, J., 202 NY 615) took the position that section 6 (now section 8) of article II did not apply to election commissioners, but only to such officers as election inspectors, poll clerks and ballot clerks who are responsible for the registration of voters, distributing ballots or the receiving, recording or counting of votes at elections.
The fact that the Court of Appeals affirmed on Justice Burr’s concurring opinion, which was silent as to any such limitations, may be taken as a clear indication that its earlier reference in Rathbone to election officers was intended to mean election commissioners. In addition, there is considerable subsequent case law on the subject which takes the same view.
*261 In Matter of Metz v Maddox (189 NY 460) the Court of Appeals, in striking down a statute authorizing the Supreme Court to recanvass and recount the votes for Mayor of New York City, held that the State Legislature may not authorize a recount and recanvass by any group other than a bipartisan board as required by section 6 (now section 8) of article II of the Constitution. Under the law, commissioners of election canvass votes (Election Law, §§ 272, 273-280) and recheck absentee and military votes (Election Law, § 274).
The case of Matter of Adams v Flanagan (201 App Div 735, affd 234 NY 540) cited by the petitioners, is not applicable. It was there held that section 8 of article II did not prohibit the transfer of functions from the Board of Elections to the county clerk of furnishing ballots to absentee voters and transmitting the ballots when received to inspectors of election, because such duties did not constitute distributing ballots at the polls to voters or receiving, recording or counting votes at elections.
In response to this, the revisers at the 1938 Constitutional Convention altered the meaning of section 8 of article II by striking out the words "at the polls” thereby leaving the affected clause to read "of distributing ballots to voters”. The purpose in so doing was to extend the requirement of bipartisanship of election boards to the distribution of ballots to absentee voters (1938 NY State Constitutional Convention, J and Docs, No. 4, p 2).
Here again, since one of the required duties of the election commissioners is to distribute ballots to the military absentee voter (Election Law, § 306), their duties bring them within the intent and purpose of section 8 of article II.
Other cases which hold directly or inferentially that the office of election commissioner is the one contemplated by section 8 of article II are Matter of Finegan v Cohen (275 NY 432) including persons charged with the duty of counting or aiding in the count or canvass; Matter of Thomas v Wells (288 NY 155) upholding the power of a board of supervisors to refuse to appoint the person recommended; Matter of Crews v Cohen (164 Misc 476) including directors of the count to tally the vote for the New York City Council; and Matter of Claffy v Board of Supervisors (193 Misc 449) requiring both commissioners of election to receive equal pay.
Furthermore, it is clear that what the framers of the Constitution intended to guarantee was bipartisan supervision and control over the conduct of elections. At the 1894 Consti *262 tutional Convention, in the discussion of the selection of the officials to be charged with the conduct of elections, as now set forth in sections 30 and 31 of the Election Law, it was pointed out: "[T]he Legislature should provide, not that bi-partisan election boards should be appointed by any officer of either party, but that either party should have its own right of nominating and electing the officers who are to control the election. It changes the policy from that which has sometimes prevailed, of permitting an incumbent of an office, a mayor or a Governor of an adverse party, and is intended to provide that the parties themselves shall designate those who shall represent them as election officers.” (Ill Revised Record of Constitutional Convention of State of NY, 1900, remarks of Mr. Lauterbach, p 114).
The common concern throughout the convention was the need for "fair elections” and the need to devise a mechanism to provide for them. What better way than to insure, as subdivision 1 of section 30 of the Election Law does, that the majority party could not frustrate the selection of an independent, responsible and concerned representative of the minority party. Subdivision 1 of section 30 implements the very point and purpose of section 8 of article II of the State Constitution to secure "equal representation of the political parties.” Its very reason for passage was to correct "a peculiar quirk in that the members of one party are asked to approve the Commissioners of Election of a second party. This sometimes results in the majority party dominating the entire Board of Elections” (NY Legis Ann, 1971, Memorandum of Assemblyman Fred G. Field, Jr., p 201).
"Our entire Election Law looks to a bi-partisan effort in the conduct of elections and for this purpose, Board of Elections are made up of representatives of both major parties.
"The theory behind the present law is that each party will select its own personnel and having done so, the normal political competitive climate will assure a fair election. In Albany, however, the majority party has refused to appoint the chosen representatives of the minority party. At the present time, two election commissioners are holding over in the County of Albany who have been rejected by their own County Committee.
"Recourse to the Courts is not possible since the Court maintains the position that it may not mandate a Legislative Act (Matter of Ahern v. Board of Supervisors, 7 A.D.2nd, 538, *263 affd. 6 N.Y. 2nd 376; Matter of Thomas v. Wells, 288 N.Y. 155; Matter of Kane v. Gaynor, 144 App. Div. 196, affd. 202 N.Y. 615).
"To permit the present condition to continue is to permit the majority party to dominate completely the elective process within Albany County.” (NY Legis Ann, 1971, p 201, supra.)
Because subdivision 1 of section 30 of the Election Law is both governed and authorized by section 8 of article II of the Constitution, the petitioners’ application to declare it unconstitutional is denied.
The petitioners’ second argument, which goes to the asserted improprieties in the calling and conduct of the meeting and the manner of voting, although ably presented, is equally unavailing.
Northrup is not a member of the Democratic county committee and therefore has no standing to object to its procedures (Connolly v Cohen, 26 NYS2d 440). However, this does not bar the bringing of this proceeding because his copetitioner, Terra, is a member and therefore may apply to set aside an election (Matter of Election of Directors of FDR-Wilson Democrats, 57 Misc 2d 743). Further, Northrup has a property interest in the office he now occupies and, accordingly, has the standing to challenge the section of the Election Law upon which his ouster depends (see, e.g., Matter of Battipaglia v Executive Committee of Democratic Committee, 20 Misc 2d 226).
Although the conduct and management of an unincorporated association such as a political committee may be reviewed in an article 78 proceeding and its rules enforced if they are not repugnant to State law (Matter of Casey v Nuttall, 62 Misc 2d 386; Matter of Davie v Riesner, 13 Misc 2d 1019), we are met at the threshold with the prevailing rule that courts are reluctant to interfere with the internal affairs of an association as long as its procedures do not violate standards of fair dealing (Matter of F.I.G.H.T., 79 Misc 2d 655). We do not believe the claimed irregularities violated such standards.
Although the notice of meeting did not, in specific language, state there would be a vote upon the selection of an Election Commissioner, it did set forth the agenda of the meeting, including items "8. Unfinished Business” and "9. New Business.” The situation here is similar to that in Matter of Littig v Democratic County Committee (179 Misc 520) where the *264 notice stated that the meeting was to be held in order to organize, that officers were to be elected and that any such other business which might properly come before the meeting would be conducted. At the meeting five persons were elected to fill vacancies on the committee and an attack upon the adequacy of the notice of the meeting was denied. The court held that the notice was sufficient for the purpose of transacting any business within the power of the county committee.
Actually, a particularized notice of the specific purpose of a meeting is required in only the most extraordinary circumstances and where matters of grave and consequential importance to the membership are involved. Some examples of the unusual situations where the courts have required such notice are: ouster of an officer (Matter of Bandanza, 132 Misc 817); dissolution (Industrial Trust Co. v Greene, 17 RI 586); dissolution of a political organization and incorporation of a new one using the same name (Height v Democratic Women’s Luncheon Club of N. J, 131 NJ Eq 450); affiliation with a national union (Bacon v Paradise, 318 Mass 649).
The objection that there was no quorum present at the meeting is also without merit since section 5 of article III of the committee rules provides that proxies may be included in the counting of a quorum for the purpose of transacting business.
Of course this would depend upon the validity of the proxies, which is also being attacked. However, the objection that one may not delegate a previously unsolicited and unexpressed opinion or position by proxy cannot be sustained. Any vote on a question coming before a meeting is an expression of opinion. The use of proxies at all meetings of the county committee is authorized by section 3 of article III of the rules, and every member should know that when he or she executes a proxy that the vote is cast according to the opinion or determination of such proxy. As a matter of fact, no donor of a proxy is appearing here to object to the manner in which his or her vote was cast.
The fact that more than one donee’s name appears on some of the proxies is at most a mere irregularity and does not vitiate their legality (see Matter of Hammer v Curran, 203 Misc 417). Furthermore, it appears that Northrup was permitted at the meeting to examine every proxy and those to which he objected were not voted. Apparently no objection was there raised to the ones now being questioned.
*265 Petitioners argue that an important meeting such as this requires more than a technical quorum, even if the proxies are allowed, and that the actual physical presence of a majority of the members is called for. However, this is not required either by the committee rules or State law.
A case quite on point is that of Blaikie v Knott (277 App Div 461) where the First Department upheld a county committee rule establishing 200 members, out of a total of 12,000, as a quorum. Section 31 of the Election Law does not require, the court held, the vote of a majority of the entire membership of the county committee in order to properly adopt a resolution to recommend someone as a Commissioner of Elections but simply a majority of a quorum present at the meeting.
..The further objection that the vote was a preference vote rather than a vote determining that Losinger was "fit and proper” is also without merit. No objection was taken at the meeting to the manner in which the resolution was phrased or voted upon. Since only one name may be submitted to the County Legislature at a time (Election Law, § 31) it was reasonable and proper for the committee to express its preference as to which candidate should be certified.
In Matter of Mariani v Van Lengen (25 AD2d 716) the county committee found eight persons to be "fit and proper”. Since only one could be submitted to the board of supervisors, the committee voted to give the party chairman discretion to choose one and the Fourth Department upheld this manner of preferential selection. In the case at bar the committee, rather than the chairman, made the decision and, by so doing, at the same time gave the chairman the necessary authority to certify the selection as "fit and proper”, which he did.
The fact that the notice of meeting was sent to committee people who might be elected on April 6, 1976 rather than to those in office on March 29, 1976 is, at most, a mere irregularity. No allegation is made that anyone voted at the April 12 meeting who was not a duly elected member of the county committee.
For all of the foregoing reasons the petitioners’ application is denied.

 Subdivision 1 of section 30 of the Election Law reads in part: "Provided, however, that if such county legislative body shall fail or refuse to appoint any person recommended for appointment as a commissioner in accordance with the provisions of section thirty-one of this chapter, within thirty days from the date of the filing of such recommendation with the county legislative body, then the commissioner shall be appointed by the members of such county legislative body who are of the same political party as is the committee chairman who made and filed such recommendation.”