THE STATE OF KANSAS, *on the relation of S. B. Bradford, Attorney General,* v. THOMAS D. HAMILTON.—SAME V. JAMES YOXALL *et al.*

WALLACE COUNTY—*Organization Abolished by the Legislature.* The legislature has the power to abolish a county organization, and has exercised that power by vacating and setting aside the county organization of Wallace county.

*Original Proceedings in Quo Warranto.*

TWO actions brought in this court on January 17, 1888, by *The State,* on the relation of the attorney general, to determine whether the county of Wallace is organized, or not. The facts are sufficiently stated in the opinion.

*Johnson, Martin & Keeler,* for plaintiff.

*Waters, Chase & Tillotson,* and *G. C. Clemens,* for defendants.

The opinion of the court was delivered by

JOHNSTON, J.: These are two actions in the nature of *quo warranto,* originally brought in this court, and which were submitted upon the same testimony and argument, and will

be disposed of together.   The first was brought in the name of the state of Kansas, upon the relation of the attorney general, against Thomas D. Hamilton, who assumed to be county attorney of Wallace county, questioning his authority to exercise and perform the functions and duties of that office; and the second was brought upon the same relation against James Yoxall and several other defendants, who claim to be county officers of Wallace county, and are assuming and exercising all the powers and duties of county officers of an organized county. Appropriate pleadings were filed to close the issues, but the avowed purpose of both proceedings is to have determined whether or not Wallace is an organized county of the state. Some of the principal facts relating to the organization may be shortly stated in the order of occurrence, as follows:

In 1868 the legislature bounded and named the county, and at the same time attached it to the county of Ellis for judicial purposes. (Special Laws of Kansas, 1868, ch. 14.)

In August, 1868, proceedings for the organization of Wallace county were instituted, and on the 25th of that month Samuel J. Crawford, then governor of the state, issued a proclamation reciting that it had been made to appear to him that the county of Wallace contained the requisite number of inhabitants to entitle the people of the county to a county organization, and that he had commissioned county officers, and he thereby declared and designated Pond City to be the temporary county seat.

By chapter 14 of the laws of 1871, the legislature provided that the county of Wallace should constitute the ninetieth representative district, and that it should also constitute a portion of the twenty-ninth senatorial district.   The legislature of 1872 created the fourteenth judicial district, of which Wallace county was made to constitute a part, and it was then attached to Ellis county for judicial purposes. (Laws of 1872, ch. 113.)

In 1875 the legislature enacted that the county of Wallace should be included in the fourteenth judicial district, and fixed the time of holding a district court within that county; but

no district court was ever held in the county. (Laws of 1875, ch. 87.)

On the 12th day of April, 1875, an action in the nature of *quo warranto* was instituted in the supreme court by the attorney general in the name of the state, against B. Day, T. S. Hays, H. W. Wheeler, persons pretending to be the county commissioners of the county of Wallace, S. W. Patton, pretending to be sheriff of Wallace county, and G. L. Redington, pretending to be county clerk of Wallace county, in which it was alleged that the organization of Wallace county was fraudulent and void in that the memorial presented to the governor was not signed by freeholders or *bona fide* inhabitants; that the affidavit thereto, purporting to have been made by three resident freeholders, alleging that the county contained a population of 600 inhabitants, was false and fraudulent; that at the time there were no *bona fide* inhabitants or freeholders in the county; and that the organization was effected for fraudulent purposes and not for the purpose of local government.    It was alleged that the county was never divided into townships, and that no first election was ever had.    The prayer of the petition was for a judgment that none of the defendants were entitled to the offices respectively claimed by them, and that they be ousted therefrom, and that the pretended organization of Wallace county is null and void, and restraining the defendants, Day, Hays, and Wheeler, from pretending to be and to act as the board of county commissioners of the county of Wallace. A judgment was entered in the case in accordance with the agreement and stipulation of the parties, in the following terms:

"This case came on regularly for hearing upon this day, and A. M. F. Randolph, relator, appeared of counsel for the state, and A. H. Case and A. D. Gilkeson of counsel for defendants.    Thereupon defendants, with the consent of the state, withdrew the answer heretofore filed by them, and elected to stand upon the demurrer filed by them to plaintiff's petition; and said demurrer being submitted to the court, it is by said court overruled with consent of parties hereto, and the following judgment by their consent rendered for plaintiff.

"Therefore it is by the court ordered and adjudged—

"1. That none of said defendants above mentioned are entitled to the offices respectively claimed by them, and that they be ousted therefrom.

"2. That the pretended organization of the county of Wallace as an organized county, by virtue of which defendants claim their offices, as in plaintiff's petition mentioned, is fraudulent and void.

"3. That defendants Day, Hays and Wheeler do not constitute a corporation as the board of county commissioners of the county of Wallace, but that there is no such corporation; and that said Day, Hays, and Wheeler, and all persons claiming through, under, or in privity with them, be forever enjoined from pretending to form or to act as a corporate body as 'the board of county commissioners of the county of Wallace.'"

By chapter 186 of the laws of 1879, the legislature declared "that the county organization of the county of Wallace, in the state of Kansas, be and the same is hereby declared null and void, and the said county organization is hereby vacated and set aside." In the same act the attorney general was authorized to commence such proceedings in the supreme court as he might deem proper and necessary for fully setting aside the organization of the county; and further provisions were made concerning the maintenance of the action, and in respect to the judgment to be rendered in case such action was brought. The proceedings thereby authorized were not commenced.

Chapter 98 of the Laws of 1881 fixed the time of holding courts in the fourteenth judicial district, and by it the county of Wallace was attached to Trego county for judicial purposes. The same legislature created the seventeenth judicial district, and included Wallace county within the district, designating it as an unorganized county, and attaching it to Trego county for judicial purposes. (Laws of 1881, ch. 100.) In 1886 a new judicial district was created, constituted in part of unorganized counties, and Wallace county was included therein and classed as "unorganized." The act contained a provision that terms of the district court should be held "in the counties of Gove, St. John, Wallace, Lane, Scott, Wichita, and Greeley,

after the same have organized, at such time as the judge of the district shall order." (Laws of 1886, ch. 120.) After the judgment of the supreme court, declaring the organization of Wallace county to be fraudulent and void, which was given in 1875, no attempt was made to maintain an organization, nor was there any pretense of carrying on a county government in Wallace county for a period of eleven years. During the greater part of that time there were but few permanent residents within the county; but in October, 1886, an effort was made to resuscitate the old organization. T. S. Hays, one of the former county commissioners, who still resided in the county, and one Frank L. Amet, a resident of Sherman county, who had once acted as county clerk under the old organization, met and proceeded to appoint county officers and to institute a county government. At the general election on November 6, 1886, persons were elected to serve as county officers, who qualified and have since assumed to exercise all the powers and duties of county officers of an organized county. The last legislation concerning Wallace county is found in chapter 145 of the Laws of 1887, which fixed the times for holding terms of court in the 23d judicial district, and it was there provided that terms of the district court should be held "in the county of Wallace on the fourth Monday in April and the fourth Monday in October, after the same shall be declared organized by the supreme court."

In March, 1887, the attorney general brought an action in this court in the name of the state against Stephen J. Osborn, as district judge, to inquire by what authority he assumed to hold a term of the district court in Wallace county. A demurrer was filed by the defendant to the plaintiff's petition, and judgment was given upon the demurrer, April 23, 1887, in favor of the plaintiff, and it was there held that under the petition and the statutes of the state, Wallace was not an organized county. (*The State, ex rel., v. Osborn, Judge,* 36 Kas. 530.) Subsequently, and in May, 1887, A. D. Gilkeson applied to the attorney general for leave to bring an action in the name of the state, in the district court of Trego county,

for the purpose of questioning the validity of the organization of Wallace county, representing that he was employed by citizens of Wallace county to assist the attorney general in instituting and conducting such action. Permission was given to him, and Gilkeson prepared a petition in behalf of the state, which was signed by the attorney general, and in which George W. McEwen, who pretended to be county treasurer of Wallace county, and William L. Dawson, who pretended to be probate judge of the county, were made defendants. An answer was prepared for the defendants by A. D. Gilkeson, and was signed by him as attorney for defendants. At the May term of the district court of Ellis county these pleadings were presented to the court, and a trial was there had on evidence introduced in behalf of the defendants. No appearance was made in behalf of the state, and the pleadings had not at that time been even filed in the district court of Trego county, and were never presented to the clerk of that court for filing until the September following. At the September term of the Trego county district court the papers in the case were presented and marked "filed," and the court then announced a decision in favor of the defendants, to the effect that the county was organized, and that the defendants were entitled to hold their offices. An entry of judgment was prepared and sent to the attorney general for approval, but his approval and consent to enter the same were never given. After some controversy it was stipulated between the attorney general for the state, and A. D. Gilkeson for the defendants, that the judgment announced should not be treated as an adjudication, but that the action should abide the result of the present proceedings. Subsequently, and on December 27, 1887, T. D. Hamilton, an associate attorney of the defendants, with A. D. Gilkeson, procured the judgment to be entered of record in Trego county.

The facts recited reveal a strange inconsistency of opinion and action concerning the *status* of Wallace county. They show that the question has frequently engaged the attention of both the legislature and the courts, and now we are again called upon to determine what the present *status* of the county

is. The case of *The State, ex rel., v. Osborn, Judge,* 36 Kas. 530, was disposed of on the pleadings, without evidence; but in the present case a large volume of testimony has been taken and produced. A great part of that taken relates to the organization of the county in 1868. On the one side it is contended that there were then no freeholders or *bona fide* inhabitants residing within the county; that the memorials and papers presented to invoke the action of the governor were false and fraudulent, and therefore that the organization itself was void. Upon the other side, it is said that there were at the time of the organization several thousand people resident within the limits of Wallace county, a large number of whom were freeholders; that the organization papers were valid on their face, and that while some of the proceedings may have been irregular, a *de facto* organization at least existed and was maintained from the time of the organization until sometime in 1875, when, by reason of bad seasons and failure of crops, the population of the county became so diminished that the people neglected to hold elections or maintain a county government until 1886; and that, having a *de facto* organization, the legislation of 1871 making the county an independent representative district and an integral part of a senatorial district, and the legislation of 1875 providing for terms of court in Wallace county, was a legislative recognition of the organization, and had the effect to legalize and validate it. The testimony relating to the organization is meager and unsatisfactory. There is very little record evidence, and in fact it appears that such records as were kept in the county have been destroyed; and the most that we have in regard to the population and preliminary steps are the statements of a few persons who formerly lived there, and whose recollection, by reason of the remoteness of the time, is very indistinct. It is clear that there was a great number of people within the county in 1868, but whether it was a temporary or a permanent population is not so clear. The Kansas Pacific railway was built into the county early in 1868, when the further construction was suspended for more than a year, and the terminus was a point

called "Sheridan," where several thousand people congregated and remained until the road was built westward. When the construction was resumed, Sheridan was nearly depopulated, most of the people going west with the extension of the road. There is testimony, however, tending to show that many of the people were permanent residents, and that some of them were freeholders; that elections were held, and that the persons elected exercised the powers and duties incumbent upon the officers of an organized county. Without going into an analysis of the testimony, we are inclined to believe that enough is shown to constitute the organization a *de facto* one, and, that being assumed, it follows that the intervention of the legislature in 1875, providing for terms of court in the county, was a recognition and ratification of the organization and cured whatever was defective in its inception. (*The State, ex rel., v. Comm'rs of Pawnee Co.*, 12 Kas. 426; *The State, ex rel., v. Stevens*, 21 id. 210.) Proceeding, then, upon the assumption that there was a legal organization of the county in 1875, has any subsequent action taken operated to dissolve that organization? The only material matters presented in these proceedings more than were before the court in *The State, ex rel., v. Osborn, Judge*, 36 Kas. 530, are the judgments that have already been referred to. The first is the judgment of this court, given upon the consent of the parties in August, 1875, which it is alleged was a collusory one, in which there was no actual controversy, brought at the instance of the Kansas Pacific railway company to enable it to escape taxation on its property, and that the judgment is of no binding force or validity. It seems that the railway company was the party principally interested in the action, and doubtless procured its institution by the attorney general. About the only property in the county subject to taxation was that owned by the railway company; and, as persons assuming to act as county commissioners and as county clerk were issuing county warrants in large amounts, the consent of the attorney general was obtained to institute the action to dissolve the organization. It was finally agreed between those assuming to be officers of the

county and the railway company that, if the outstanding demands against the county were paid, consent to the entry of a judgment without further trial, declaring the organization void, would be given. The compromise was carried out, and judgment accordingly entered. While the county officers and their attorneys consented to a judgment dissolving the organization, and probably received a considerable share of the money paid for redeeming the outstanding warrants that had been issued, it appears that the action was instituted in good faith, and not for an unlawful purpose. The pleadings presented a real issue, and fully warranted the judgment to be given. But the conclusion that we have reached makes it unnecessary to determine whether the subsequent compromise, and the consent given by the officers to a dissolution of the county organization, render the judgment invalid, and therefore we will pass it over.

The other judgment referred to, rendered by the Trego county district court in 1887, after the case of *The State, ex rel., v. Osborn, Judge,* supra, had been disposed of in this court, determined nothing, and is clearly void. The state never instituted nor brought the action to trial; neither was there any appearance made in its behalf when the hearing was had. There was no adverse controversy, no actual trial, nor any real decision. The hearing that was had occurred in Ellis county, where the court was without authority to try the case if it had been a *bona fide* controversy. If Wallace county was organized, as defendants contend, the jurisdiction was in the district court of that county; and if it is unorganized, then the jurisdiction of matters arising therein is in the district court of Trego county. "To receive credit as an estoppel, a judgment or decree must be a judicial determination of a cause agitated between real parties, upon which a real interest has been settled. In order to make a sentence there must be a real interest, a real prosecution, a real defense, and a real decision. Of all these requisites, not one takes place in a fraudulent or collusive suit." (Freeman on Judgments, § 250.) There was no adverse controversy or issue of fact between par-

ties here, no real trial on the merits; and indeed the subsequent action of the attorney for the defendants, who undertook to represent both parties, indicates that he did not regard the proceeding and judgment to be *bona fide* and binding. He stipulated as attorney for the defendants with the attorney general that the judgment should not be treated as an adjudication, and that the action should abide the result of the present one. He is correct in that view, as a judgment thus obtained is entitled to no credit and concluded no one. This virtually disposes of the question in these cases, and settles it in favor of the plaintiff, that Wallace is an unorganized county.

*Wallace county— organization abolished by the legislature.*

The only other matter presented here is the interpretation and effect of the legislative acts; and this was considered and settled in *The State, ex rel., v. Osborn, Judge,* 36 Kas. 530. The statutes to which we are now referred were then examined, and the conclusion was reached that the act of 1879 operated to disorganize the county. It is so declared in plain and unequivocal terms, and the subsequent legislative acts of 1881, 1886, and 1887, designating Wallace as an unorganized county, indicate the legislative view of the act of 1879, and distinctly recognize that the organization had thereby been vacated and set aside. There is no constitutional restriction upon the power of the legislature to abolish municipal and county organizations, and the existence of the power is not disputed and cannot be doubted. (*Division of Howard Co.,* 15 Kas. 194; *In re Hinkle,* 31 id. 712; *The State, ex rel., v. Meadows,* 1 id. 90; *Duncombe v. Prindle,* 12 Iowa, 1; Dill. Mun. Corp. §§ 46, 65.)

It is unnecessary to reëxamine the legislative act of 1879 vacating the organization of Wallace county, as we are satisfied with the conclusion reached in *The State, ex rel., v. Osborn, Judge,* supra, that Wallace is an unorganized county; and therefore the judgment in each of these cases must go in favor of the plaintiff, as prayed for.

All the Justices concurring.