(May 12, 1905.)

## McDONALD v. DOUST.

### [81 Pac. 60.]

CONSTITUTIONAL LAW —ACT ABOLISHING A COUNTY—POWER OF LEGISLATURE OVER COUNTIES.

1. Section 1 of article 18 of the constitution recognizes the counties organized and existing at the date of its adoption, and it is not within the power of the legislature to destroy or abolish such governmental organizations.

2. Acts inconsistent with the spirit of the constitution are as much prohibited by its terms as are acts specifically enumerated and forbidden therein.

3. Act of the legislature approved February 28, 1905, entitled "An act to abolish the county of Kootenai within the state of Idaho, and create and organize the counties of Lewis and Clark within said state, define the boundaries thereof, and locate the county seats of Lewis and Clark counties, apportion the debt of Kootenai county between Lewis and Clark counties, and to provide for the appointment of officers in said Lewis and Clark counties, and for transcribing a portion of the records of Clark county, and to constitute said counties of Lewis and Clark a part of the first judicial district of the state of Idaho," is unconstitutional and void in that it attempts to abolish and destroy an organized county of the state.

(Syllabus by the court.)

ORIGINAL application for a writ of mandate. Alternative writ issued and upon hearing writ quashed and action dismissed.

Edwin McBee, Ezra Whitla, C. W. Beale, Herman H. Taylor and McClear & Burgan, for Plaintiff.

In this matter the defendant has filed a demurrer to the

petition of the petitioner and attacked the constitutionality
of the act of the legislature under which he is acting as sheriff
of the county of Clark, state of Idaho. In our judgment
there is but one question for determination in this matter and
that is, Has the legislature of the state of Idaho, under the
constitution of our state, the right to abolish a county and
create and organize others from such territory? The right
of the legislature to abolish a county has been upheld by this
court and by nearly all other courts of the Union. (*Blaine
County v. Heard*, 5 Idaho, 6, 45 Pac. 890; *People v. Alturas
Co.*, 6 Idaho, 418, 55 Pac. 1067, 44 L. R. A. 122; *Wright v.
Kelly*, 4 Idaho, 624, 43 Pac. 565; *Division of Howard County*,
15 Kan. 194; *State v. Hamilton*, 40 Kan. 323, 19 Pac. 723;
*State v. Commrs. of Kiowa Co.*, 41 Kan. 630, 21 Pac. 601.
*Portwood v. Board of Supervisors*, 52 Miss. 523; *Coles v.
Madison County*, 1 Ill. (Breese) 154, 12 Am. Dec. 161.)
Section 2 of article 1 of our constitution also authorizes the
abolition of a county and is in language as follows: "All
political power is inherent in the people. Government is in-
stituted for their equal protection and benefit, and they have
the right to alter, reform or abolish the same, whenever they
may deem it necessary; and no special privilege or immunity
shall ever be granted, and may not be altered, revoked, or
repealed by the legislature." (*State Bank v. Knopp*, 16
How. (U. S.) 369-380, 14 L. ed. 977.) In the case of *Division
of Howard County*, 15 Kan. 215, the supreme court of that
state took occasion to say: "In the case of *Hunt v. Meadows*,
1 Kan. 90, it was held that an act of the territorial legis-
lature, passed after the state was admitted into the Union,
destroying the county of Madison, was invalid." In Iowa, in
the case of *Duncombe v. Prindle*, 12 Iowa, 1, it was held that
an act destroying the county of Humboldt was valid. And
we think such acts are valid. Of course, when a county is
destroyed, the county seat must go with it. The county seat
of an old county need not be made the county seat of any new
county, or indeed of any county, new or old, into which such
county seat may be placed by a change of county lines, or by
the creation of a new county. Where a new county, formed

out of territory taken from an old county, includes within its limits the county seat of the old county, such place ceases to be the county seat of the old county, and does not become the county seat of the new county. (7 Am. & Eng. Ency. of Law, 2d ed., p. 1045, subd. 4; *Attorney General v. Fitzpatrick,* 2 Wis. 542.) The power to locate a county seat, in the first instance, belongs to the legislature, and it is not necessary that there should be any vote of the electors of the county upon the question. (7 Am. & Eng. Ency. of Law, 2d ed., 1013-1015; *Doane v. Logan County,* 3 Idaho, 38, 26 Pac. 167; *Attorney General v. Iron County,* 64 Mich. 607, 31 N. W. 539.) In *County of Cherokee v. State,* 36 Kan. 337, 13 Pac. 558, the supreme court of Kansas laid down the rule that in determining whether an act of the legislature is unconstitutional it is the duty of the courts to give such a construction to it, if possible, as will uphold the act. See, also, upon this branch of the case, *Wright v. Kelly,* 4 Idaho, 624, 43 Pac. 565; *Bonhomme County v. Berndt,* 15 S. Dak. 494, 90 N. W. 147; *Cook v. Port of Portland,* 20 Or. 580, 27 Pac. 263, 13 L. R. A. 533; *Santo v. State,* 2 Iowa, 165, 63 Am. Dec. 487; *Town of McGregor v. Baylies,* 19 Iowa, 43.

Fremont Wood, Edgar Wilson and Charles L. Heitman, for Defendant.

The legislature cannot abolish a county or a county government. Section 1, article 18, of our state constitution provides: "The several counties of the territory of Idaho as they now exist are hereby recognized as legal subdivisions of this state." (*Lincoln Co. v. George,* 3 Idaho, 108, 26 Pac. 983.) We are aware that the decisions of some of the states hold in direct terms that counties may be abolished at the legislative will. We have examined many of these cases and in no instance do we find a constitutional inhibition against such legislative abolition of counties similar to the one in our constitution. The legislature cannot remove the county seat from Rathdrum to Coeur d'Alene, as provided in this act, without a compliance with the requirements of section 2 of

article 18 of the state constitution. The legislature cannot do indirectly that which it is forbidden to do directly. This is a rule dictated by reason, and supported by the highest authority. (*Craig v. State,* 4 Pet. 410, 7 L. ed. 903.) It will be noted that the constitutional inhibition against a legislative removal of the county seat without a vote of the people in Illinois is not nearly so exacting as section 2 of article 18 of our constitution. (See, also, *James Co. v. Hamilton Co.,* 89 Tenn. 237, 14 S. W. 601, before cited.) The act in question is void and unconstitutional, because it does not lie within the power of the legislature to abolish a county organization or a county government. (*James Co. v. Hamilton Co.,* 89 Tenn. 237, 14 S. W. 601; *People v. Marshall,* 12 Ill. 391.)

AILSHIE, J.—This is an original application by the plaintiff, praying for the issuance of a writ of mandate. The plaintiff alleges that at the general election held in November, 1904, the defendant, Edwin Doust, was duly elected sheriff of the county of Kootenai, and thereafter qualified and entered upon the discharge of his duties as such sheriff. That thereafter the legislature passed an act abolishing the county of Kootenai and creating the counties of Lewis and Clark, and that by the provisions of the act, the governor was authorized and directed to appoint county officers for each of the new counties, and that in accordance therewith he appointed the plaintiff as sheriff of the county of Clark, and that plaintiff immediately entered upon the discharge of his duties as such sheriff and demanded of the defendant as the former sheriff of Kootenai county that he deliver over to plaintiff the records, money, property and prisoners within his care and custody belonging to the county of Clark, and that the defendant refuses so to do. The defendant demurred to the petition and at the same time answered, and under both his demurrer and answer urges that the act abolishing Kootenai county, and creating the counties of Lewis and Clark is unconstitutional and void. The act in question was approved on the twenty-eighth day of February, 1905, and is entitled: "An act to abolish the county of Kootenai within

the state of Idaho, and create and organize the counties of Lewis and Clark within said state, define the boundaries thereof, and locate the county seats of Lewis and Clark counties, apportion the debt of Kootenai county between Lewis and Clark counties, and to provide for the appointment of officers in said Lewis and Clark counties, and for transcribing a portion of the records of Clark county, and to constitute said counties of Lewis and Clark a part of the first judicial district of the state of Idaho." Section 1 of the act is as follows: "The county of Kootenai, in the state of Idaho, shall be and is hereby abolished, and the county of Lewis and the county of Clark in said state are hereby created, and said counties of Lewis and Clark shall embrace all the territory heretofore included within the boundary of said Kootenai county." By the further provisions of the act the territory comprising Kootenai county is divided between the two new counties, and the county seat of Lewis county is established at Sandpoint, and that of Clark at Coeur d'Alene City. It contains an emergency clause whereby the act goes into effect immediately upon its approval, and the governor is directed to appoint officers for the two counties within ten days after the approval of the act; but there is no provision in the bill for the continuation or carrying on of county government from the time the act goes into effect until the new officers qualify.

By section 1 of this act the county of Kootenai is abolished and from the identical territory formerly constituting and comprising that county, two counties are created, to be known as Lewis and Clark, respectively. To my mind the controlling, and in fact the only serious, question in this case is the power of the legislature to abolish and destroy a county existing at the time of the adoption of the constitution. If this question be resolved in favor of the exercise of such power, then, in my judgment, the act under consideration must stand. If such power does not exist, then the act is unconstitutional and void.

Article 18 of the constitution is entitled "County Organization." Section 1 of that article reads: "The several counties

of the territory of Idaho, as they now exist, are hereby recognized as legal subdivisions of this state." Section 2 of the same article provides that "no county seat shall be removed unless upon petition of a majority of the qualified electors of the county, voting on the proposition at a general election, shall vote in favor of such removal." Section 3 of the same article provides that no county shall be divided and the portion cut off be attached to another county without first submitting the question to a vote of the people in the portion to be detached. By section 4 it is provided that "no new counties shall be established which shall reduce any county to an area of less than four hundred square miles. . . . . Nor shall any new county be formed which shall have an area of less than four hundred square miles."

The only instance in which these provisions of the constitution have been directly under consideration by this court was in *People v. George,* 3 Idaho, 72, 26 Pac. 983. In that case three separate opinions were filed by the justices of this court. Mr. Justice Huston, in his concurring opinion, held that the legislature was without the power or authority under the constitution to abolish a county. Mr. Justice Morgan, who filed the principal majority opinion, held that the act of the legislature creating and establishing the counties of Alta and Lincoln from the identical territory formerly constituting Alturas and Logan was a palpable evasion of the constitution by doing in an indirect manner that which the constitution forbids being done directly, and that the evasion consisted in the attempt to cut off a portion of one county and attach it to another county without submitting the question to a vote of the people affected thereby. Chief Justice Sullivan, dissenting from the views announced by the majority of the court, expressed the opinion that the legislature had plenary power in both the abolition and creation of counties. It is true that several cases have been before our court involving acts abolishing old and creating new counties, but in none of those cases has the question here involved been directly in issue or squarely passed upon by our court. In *Doan v. Board of Commissioners,* 3 Idaho, 38, 26 Pac. 167, it was

held that section 2, article 18, of the constitution does not apply to the location of a county seat consequent upon the creation of a new county. In *Wright v. Kelley,* 4 Idaho, 624, 43 Pac. 565, the court declined to pass upon the constitutionality of an act of the legislature creating Blaine county, on the ground that such question could not be raised upon application for writ of mandate by a private party. In *Bellevue Water Co. v. Stockslager,* 4 Idaho, 636, 43 Pac. 568, it was held that the constitutionality of an act creating Blaine county could not be tested upon application of a private party for a writ of prohibition. In *Blaine County v. Heard,* 5 Idaho, 6, 45 Pac. 890, it was held that the court could not examine the legislative journals for the purpose of ascertaining the motives of the legislature for the passage of an act. The opinion in that case concludes by saying that the act establishing Blaine county is constitutional, but that expression seems to have followed from the court's conclusion that it could not examine into the legislative motive rather than from any other point considered. It is evident from that opinion that the court did not consider or pass upon the constitutional authority of the legislature to abolish a county. This is clearly apparent when we remember that the writer of this latter opinion had stated his position in *People v. George,* that a county could not be abolished by legislative act. In *People v. Alturas County,* 6 Idaho, 418, 55 Pac. 1067, 44 L. R. A. 122, the constitutionality of the act establishing Blaine county was sustained by reason of the application of the doctrine of estoppel, and no other point was passed upon in the case.

From the foregoing it is fair to say that in this state there is no expression which has the approval of a majority of the court, as constituted at the time, upon the identical question under consideration. The nearest approach, as above stated, was in the George case, and there we have one of the learned justices saying the legislature could not abolish a county, and the other saying that it could do so, and the third holding that that particular question was not material to the determination of the case under consideration. In this state of opin-

ion, as heretofore expressed by this court, I have felt at liberty, as well as impelled by duty, to make an independent examination of this question, and in the light of our constitution to determine, if possible, the purposes of the framers of the constitution and the people in its adoption with reference to the creation, organization, dissolution and destruction of counties.

At the outset there are a few propositions which are conceded, and the statement of which will simplify the question and limit our research. Under the foregoing provisions of the constitution we find: 1. No county seat can be removed except upon a vote of the people and two-thirds of the qualified electors voting in favor of the removal; 2. No part of any county can be cut off and attached to another county without a majority of the people in the territory to be cut off voting in favor thereof; 3. No new county can be established which will reduce an old county to an area of less than four hundred square miles; 4. No new county can be created which shall have an area of less than four hundred square miles; 5. The legislature may create *new* counties. The act under consideration, if it is valid legislation, abolished the county of Kootenai, destroyed all county government therein, and, of course, abolished the seat of county government. The same act and the same section created two new counties out of the same territory and gave them two new names, viz., Lewis and Clark. The object to be attained was to have two counties where one formerly existed. There is no one questions in this case but that the legislature had the power to create the county of Lewis and establish the county seat thereof at Sandpoint, had they left the remainder of the territory organized as Kootenai county with the county seat at Rathdrum, as it had previously existed.

It is also admitted that had they not abolished Kootenai county and reorganized the county containing the old county seat, the legislature would have been powerless under the constitution (section 2, article 18) to establish the county seat at Coeur d'Alene for the same county in which the old county seat, Rathdrum, was located. Now, then, is it possible, by

saying they abolished the county and by the same act reorganized the territory containing the old county seat under a new name, with the county seat at another town, they could accomplish the ends forbidden by the constitution and thereby circumvent its operation? The purpose of creating and organizing counties is to obtain for the people local and county government. That government is as effective and operative, we take it, under one county named as another. The constitution was adopted for the establishment and in aid and furtherance of government, and not for the disorganization and abolition of government. The supreme court of Tennessee, in *James County v. Hamilton County*, 89 Tenn. 237, 14 S. W. 601, in discussing somewhat similar provisions of the Tennessee constitution to those of our constitution with reference to the creation and organization of counties and the removal of county seats, said: "From it [the constitution], it is clearly manifest the authority, and only authority, conferred is to build up, and not to pull down. It is equally apparent that it never occurred to the framers that a county could be destroyed or dissolved by an arbitrary act of the legislature. The expression of one thing is the exclusion of the other. If the constitution is so careful of the rights of old counties in taking from them fractions to form new counties; if it is so watchful of the rights of citizens in county seats, it follows that it is also jealous of any power that might utterly destroy old counties, as the passage of the act before us."

We are cited to section 2, article 1, of the constitution, where it is recited that "no special privileges or immunities shall ever be granted that may not be altered, revoked or repealed by the legislature" as authority for the legislature abolishing a county. Now, it must be apparent at once that a county organization or county government is neither a special privilege nor special immunity. On the other hand, it is a fundamental governmental right recognized and adopted by the constitution (section 1, article 1), and rests with the people (section 2, article 1), and cannot be abrogated or alienated by legislative act. It is true the manner of organ-

ization and exercise of that power are the subjects of legislative control (section 5, article 18), but the dissolution of government does not, under our constitution, rest with the legislature. At the time of the adoption of the constitution all of the territory of the state, comprising over eighty-four thousand square miles, was then organized into eighteen counties, and those counties were recognized as legal subdivisions of the state (section 1, article 18), and by the very terms of that document it was made possible to increase the then existing number of counties, as the population and wealth of the state might increase, to the maximum number of two hundred and twelve counties. This would indicate that the constitution contemplated growth and not dissolution. The constitution was framed and adopted as the organic law on which to build a commonwealth and not as a sanction for the destruction of what we already had. The thoughts and hopes of the people who adopted that document were centered on a future filled with the progress and development time is bringing us. Not a thought was entertained of ever giving up what we then had and destroying the local county governments that were recognized by section 1 of article 18.

There is no middle ground on this proposition. The legislature either can or cannot abolish a county. If they can do so at all, they can do so unconditionally and without limitation, except as controlled by section 4, article 18. The power vested in the legislature to create counties may be exercised or not, as they see fit—there exists no authority by which they can be compelled to exercise such power. If the power to abolish counties exists at all, it exists freed from all conditions and independent of the power to create counties. If these respective powers each exist they are absolute and independent of each other, and the legislature might abolish any one or all of the counties of the state without creating any county or counties to take their place and thereby leave the people without any local or county government at all. The mere statement of this proposition refutes the assumption on which it rests. No such thing can be done.

It seems to me that the authority granted by the constitution to create "new counties" does not mean to reorganize an old county under a new name. It must mean a *new* county, an *additional* county, and not a reorganization, rebounding or renaming of an old county. This is the view entertained by Justice Morgan in the George case, where he said: "I think the creation of a new county under the proviso in this section must be held to be the creation of an additional county, which the legislature may take out of any territory it may see fit, without a vote of the people." What could be the necessity for creating a new county where the people already have a county and county government, unless it be the creation of an *additional* county out of territory taken from one or more old counties? No advantage can be derived to the people by the reorganization or recreation of an old county, for the reason that by section 5, article 18, county government must be uniform throughout the state, and therefore no advantage can be acquired to the people by wiping from the map one county and replacing the same county and county government by another county exercising the same powers and authority as the old. The constitution never contemplated any vain or useless thing. Acts inconsistent with the spirit of that document are as much prohibited by its terms as are acts directly enumerated and forbidden therein. Is it possible that the framers of the constitution, and the people in its adoption meant to prohibit the removal of a county seat without a two-thirds vote of the people, and to prohibit the cutting off of territory without a vote of the people in the territory to be cut off, and to prohibit the reduction of a county below four hundred square miles, and yet intended that a county might be entirely ·destroyed and blotted out at the legislative will? I am convinced that no such proposition was ever intended or contemplated by either the framers of the constitution or the people in its adoption. If the constitution recognized the counties in the state as they existed at the time of our admission and then prohibited any of the acts enumerated above and so guarded the organization and integrity of a county, is it possible that they still meant

that by a single act of the legislature a county might be wiped out of existence? Suppose some county should so far forget itself as to elect a set of officers distasteful to the powers that dictate political fortunes and the legislature should suddenly conclude that the county ought, as a matter of political expediency, to be abolished and a new county organized from the same territory, and new officers appointed, who would conform to their ideas of government, with the county seat in a neighboring town, is it possible that such an act would be within the purview of the constitution? I think not.

The counties created and recognized by the constitution find the authority for their existence in a higher power than the legislature—that authority comes directly from the people; from the same power that makes legislatures. A strange anomaly would exist anyway if we recognized the power of the legislature under our constitution to abolish counties. Senators and representatives are elected by counties; the people of a county may be entitled to a half dozen representatives and a senator, which they elect and send to the legislature to *represent* their county, not to *destroy* it, but as soon as they arrive they get a bill through, carrying an emergency clause, abolishing the county they represent; what county will they represent thereafter? Can they legislate their county out of representation? Or can they by legislative dictum constitute themselves the representatives of the new counties? Or suppose they abolish their county and create none in its stead, where will they be? Who will they thereafter represent? These are questions which present themselves as soon as we enter this field of inquiry. And, indeed, they pass beyond the mere speculative and become actualities the moment it is admitted that the power to abolish counties exists at all.

Aside from the cases I have reviewed from our own court, I have been unable to find any decision passing upon similar constitutional provisions and a similar state of facts to those involved in the case at bar, except *People v. Marshall,* 12 Ill. 391, and *James County v. Hamilton County,* 89 Tenn. 237, 14 S. W. 601. These two cases pass upon very similar facts

and constitutional provisions to those under consideration in the case at bar and sustain the conclusion at which we have arrived. *Division of Howard County,* 15 Kan. 194, *State v. Hamilton,* 40 Kan. 323, 19 Pac. 723, *State v. Commissioners of Kiowa County,* 41 Kan. 630, 21 Pac. 601, and *Portwood v. Montgomery Co.,* 52 Miss. 523, cited by petitioner, are not in point in this case. Neither Kansas nor Mississippi have constitutional provisions at all similar to those sections of our article 18, which recognize the counties existing at the time of the adoption of the constitution, and the further provisions relating to the creation of new counties, division of counties and change of county seats. It will be further observed, from an examination of those authorities, that what is there said with reference to the power of the legislature to abolish a county consists principally in the mere statements of the court that such power exists without giving any reason therefor, as found within the constitutional provisions of those states.

I have considered this question somewhat at length, for the reason that as I view the matter our determination of this case may have a far-reaching effect upon the future organization of counties in this state. There is still enough territory in the state for the creation of one hundred and ninety new counties of the constitutional area. This question must necessarily agitate every succeeding legislature, and I believe the lawmakers and the people have a right to know the opinion of the court upon these various provisions of the constitution with reference to the creation of counties. A right determination of this question is of vast importance to the people of the state and future legislation which may be had on this subject. It is always with great reluctance that the courts hold an act of the legislature void, but the constitution is neither the production of the legislature nor the courts, and is as mandatory upon the one as the other. It emanated directly from the people, and its mandates are supreme and must be obeyed by every branch of the state government. We must apply it as we find it, and not as it might have been. It follows from what has been said that I consider the act

under consideration in violation of the constitution. It is so held, and the writ will be quashed and the proceeding dismissed.

Sullivan, J., concurs.

STOCKSLAGER, C. J., Dissenting.—The authority of the legislature to create two new counties out of the territory comprising one county is the constitutional question before this court for determination.

There was no attempt on the part of the legislature in the act under consideration to cover up or conceal the purpose of the act. After weeks of patient work in the committees the act creating Lewis and Clark counties out of the territory then comprising Kootenai county was reported favorably, passed both Houses by a large majority vote and was promptly signed by the chief executive of the state. It is a matter of public history shown by the map of the state that Kootenai county is larger in square miles than some of the New England states. It is also shown by the records of the state that Kootenai county has the wealth, square miles and population out of which two counties may be created with more wealth, area and population than many of the counties of the state as they now exist. It is also true that Rathdrum, the county seat of Kootenai county, is located near the western line of the county and very inconvenient to a large majority of the taxpayers of the county. It is also true that the county buildings and property at Rathdrum are not permanent or valuable, and that the loss to the taxpayers by reason of the removal of the county seat from Rathdrum or its· location elsewhere would be trifling. All these questions were before the law-making power of the state and ably presented by learned counsel for both factions to the controversy. It is evident from the act passed that the legislature believed that the better interests of all the people of Kootenai county would be best served by the division of the county and location of the county seat of Lewis county at Sandpoint and that of Clark county at Coeur d'Alene City.

Unless the legislature has exceeded its powers in the passage of this act, it should stand as the law of the state, and this seems to be the only question in the case. It must be conceded that the constitution of this state, as well as that of every state in the Union, vests large discriminating powers in the legislature, and unless there is a direct and positive prohibition in the constitution, the acts of the legislature should be upheld by the courts. As I view the constitution, there is nothing that prohibits the legislature from doing just what is shown by this act, and as I read the decisions of this court in the numerous cases that have been before it since the adoption of our constitution, directly bearing on the constitutionality of an act creating new counties, I am unable to find any of them that would not have upheld a law similar to the one under consideration. I cannot see the force of the plea of sacredness in the name of "Kootenai" county or "Rathdrum" as its county seat. The same plea was entered for old Alturas county, and Hailey as the county seat, in *People v. George,* 3 Idaho, 72, 26 Pac. 983, referred to in the majority opinion, and whilst the writer of this opinion was a resident of Hailey, Alturas county, at the time of the litigation above referred to, has never changed his residence. He now lives at Hailey, Blaine county. Alturas county was cut up and parceled out to Elmore and Logan counties and one portion left with the name of Blaine county, with Hailey as the county seat. Yet my associates say that this court has never passed upon the question now before the court. If the entire importance of the question before us is involved in the location of the county seat, then *People v. George* gives us no light, as less than half of the territory formerly belonging to Alturas county remains in Blaine with Hailey as the county seat. I do not attach so much importance to the sacredness of the name for a county seat, nor do I believe that any town has a vested right to remain the county seat of a county when conditions have so changed that the interests of a large majority of the people demand a change. I also believe that it was the intention of the framers of the constitution to vest the legislature with power to

meet and provide the people with such changes as might seem best for their interests.

Taking up and discussing the questions in the order followed by my associates, we find first article 18 of the constitution referred to. Section 1 provides that the several counties as they now exist are recognized as legal subdivisions of the state. Section 2 provides that no county seat shall be removed unless upon petition of a majority of the qualified electors of the county voting on the proposition at a general election shall vote in favor of such removal. Section 3 provides that no county shall be divided and the portion cut off be attached to another county without first submitting the question to a vote of the people in the portion to be detached. By section 4 it is provided that no new county shall be established which shall reduce any county to an area of less than four hundred square miles. Nor shall any new county be formed which shall have less than four hundred square miles. Section 1 needs neither comment nor construction. It only disposes of the counties of the state or territory as they existed at the time of the adoption of the constitution. Section 2 has no bearing on the question before us, for the reason that the act does not attempt to remove a county seat of one of the organized counties of the state to which the constitution refers unless "a petition of the majority of the qualified electors of the county voting on the proposition at a general election shall vote in favor of such removal."

If the legislature had attempted to remove the county seat of Kootenai county to Sandpoint, Coeur d'Alene City, or any other town in that county, then section 2 above referred to would be directly applicable. The law does no violence to section 3, as there is nothing contained in any of the provisions of the enactment that in any way attempts to cut off any portion of Kootenai county and attach it to any other county of the state "without first submitting the question to a vote of the people in the portion to be detached." Section 4 is not violated as there is no contention that each of the new counties created by the act have not within their boundaries all the requirements of the constitution. Nor is there any at-

tempt to reduce any county of the state to an area of less than four hundred square miles. The attempt was to abolish, destroy or wipe from the map of the state Kootenai county, and create out of the territory comprising that county the counties of Lewis and Clark. No attempt to do indirectly that which was prohibited from being done directly. No attempt to take territory from one county and add it to another without submitting the question to a vote of the people in the territory affected.

All this being true, the language of Mr. Justice Morgan in *People v. George* has no application to the facts in this case. A statement of the facts in *People v. George* will readily disclose the reasons for the language of Justice Morgan quoted in the majority opinion—it follows: "On the 3d of March, 1891, the legislature passed an act entitled, 'An act to create and organize the counties of Alta and Lincoln, to locate the county seats of said counties and to apportion the debt of Logan county.' The first section establishes the county of Alta composed of the territory of Alturas county as it then existed and about half of the contiguous territory of Logan. Section 2 establishes the county of Lincoln from the residue of the territory theretofore belonging to Logan." After this statement of the facts Mr. Justice Morgan says: "The question that must determine this case is, Can a portion of the territory of one county be cut off and attached to another without a vote of the people residing in the segregated portion consenting thereto in the manner adopted in this act?" He further says: "It is evident that the whole intent and object of the act was to cut this body of territory from the county of Logan and attach it to the county of Alturas. In fact, I understand the counsel did not deny that this was the sole object."

Mr. Justice Huston, in his concurring opinion in the George case, says: "The obvious intent, purpose and effect of the act in question was to cut off or segregate a portion of Logan county, and attach the same to Alturas county, not for the purpose of creating a new county in the sense that term is evidently used in section 3, but solely, entirely and exclu-

sively for the purpose of enlarging the area of Alturas county.'' Mr. Chief Justice Sullivan, who dissented in the George case, quoted a number of authorities in support of his views, and whilst the facts in the case at bar differ very materially from the George case yet some quotations from his opinion will not be inappropriate. A careful reading of the three opinions in the George case discloses that Mr. Justice Morgan declined to pass upon the question of the right of the legislature to abolish a county, asserting it was not necessary to determine the question, Mr. Justice Huston holding that no such power was given to the legislature by the constitution, whilst Mr. Chief Justice Sullivan took the broad, and I think, more liberal view that after the adoption of the constitution the creation of new counties and abolishment of old ones was entirely within the legislative power of the state. I do not wish to be understood as agreeing entirely with the views expressed by Mr. Chief Justice Sullivan in the George case. I am more inclined to agree with the position of Mr. Justice Morgan—that is, that the legislature attempted to do something indirectly which was prohibited by the constitution from being done directly. In other words, when they attempted to take half of the territory of Logan county and give it to Alturas county by merely changing the name of Alturas to Alta, and Logan to Lincoln, and without submitting the question to a vote of the people affected by the change, it was an infringement upon the constitutional rights of the people residing within the boundaries of such territory. No such condition arises in the case at bar. It is purely and simply an attempt to make two counties out of one evidently in the view of the legislature to better accommodate the people of the territory comprising Kootenai county. In the George case Mr. Chief Justice Sullivan says: ''It is also a well-established rule that an express power to make laws is not necessary to enable the legislature to make them. The court is called upon in this case to declare a solemn legislative enactment unconstitutional and void.'' Then quoting from Judge Cooley in his work on Constitutional Limitations, page 192, says: ''The power to declare a

legislative enactment void is one which the judge, conscious of the fallibility of human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility." Quoting further from the opinion: "Courts have not the power to declare acts of the legislature void simply because in the opinion of the court such acts are repugnant to natural justice and expediency."

When the constitution of Idaho was framed it was known that the legislature had exercised the power of changing the boundaries of counties and creating new ones and that certain consequences resulted therefrom. The framers of the constitution saw fit to prohibit the legislature from striking off a part of one county and attaching it to a county then in existence, without submitting the question to a vote of the people residing in the part to be stricken off, but expressly provide that such inhibition shall not apply to the creation of new counties. From a careful reading of the act under consideration and the three opinions filed in *People v. George* it occurs to me that the author had carefully studied the three opinions and attempted to so draft the bill that it would be free from objections of at least one, if not both, of the majority opinions. I am thoroughly convinced that with the same state of facts before the court in *People v. George,* as we have before us in this record, if a dissenting opinion had been written it would have been by Mr. Justice Huston instead of Mr. Chief Justice Sullivan.

My associates attempt to explain *Doan v. Board of Commissioners,* 3 Idaho, 38, 26 Pac. 167, *Wright v. Kelley,* 4 Idaho, 624, 43 Pac. 565, *Bellevue Water Co. v. Stockslager,* 4 Idaho, 636, 43 Pac. 568, *Blaine Co. v. Heard,* 5 Idaho, 6, 45 Pac. 890, and *People v. Alturas County,* 6 Idaho, 418, 55 Pac. 1067, 44 L. R. A. 122, by saying none of them have passed directly upon the question before us. Be that as it may, the fact exists, that two counties that were upon the map of our state at the time of the adoption of our constitution have been abolished, destroyed, blotted from the map of the state, to wit, Alturas and Logan, and we have in their stead

Blaine and Lincoln. Every step looking toward the destruction of these two counties was vigorously resisted, and learned counsel from Salt Lake, Boise and elsewhere were employed to guard the interests and existence of the two old counties, but history speaks for itself—this court *did* uphold the legislature and the two counties were abolished.

The majority opinion says: "The purpose of creating and organizing counties is to obtain for the people local and county government. . . . . The constitution was adopted for the establishment and in aid and furtherance of government and not for the disorganization and abolition of government." Certainly no one will dispute that proposition, but is it not true that the bill provided for the immediate organization of government for both of the counties created out of the territory of Kootenai? And is it not also true that the governor in compliance with the provisions of the law appointed officers for both counties, who qualified and entered upon the discharge of their several duties? In *James Co. v. Hamilton Co.*, 89 Tenn. 237, 14 S. W. 601, cited in the majority opinion, the legislature attempted to take all the territory of one county and parcel it out to the neighboring counties, thus entirely abolishing a county and leaving nothing in its place; instead of dividing James county and from a portion of its territory creating a new county and leaving the remaining territory in the name of James county or giving it a new name the entire territory was given to other counties. This the Tennessee court said could not be done, and I see no objection to the decision.

It is said in the majority opinion: "Suppose some county should so far forget itself as to elect a set of officers distasteful to the powers that dictate political fortunes and the legislature should suddenly conclude that the county ought, as a matter of political expediency, to be abolished and a new county organized from the same territory, etc." Of course not; the supposition is violent. Legislatures are not supposed to do vain, useless or vicious things. Their acts are entitled to full faith and credit in all things. They are

elected by the people and are responsible to the people for their every act.

Section 2 of article 1 of our constitution says: "All political power is inherent in the people. Government is instituted for their equal protection and benefit and they have the right to alter, reform or abolish the same whenever they may deem it necessary; and no special privilege or immunities shall ever be granted that may not be altered, revoked or repealed by the legislature." It occurs to me that the framers of the constitution intended to clothe the legislature with large discretionary powers in the future upbuilding of the state. What government may be altered, reformed or abolished by the legislature? Does it mean state government or does it mean state and county government? Alturas and Logan counties answered by the action of the legislature and afterward by the decisions of this court that it meant county government at least. I might prolong this discussion, but it seems unnecessary; the importance of the question to the people of the state in its future legislation warned me that I should not pass the question by without recording my views. It is well known to every resident of our great and growing state that we must soon meet the demands of the people for better accommodations in our large counties, some of which are empires in area and rapidly filling up with population sufficient for two or more counties. It seems that one of the great objections to the law is that it attempts to remove the county seat from Rathdrum without a vote of the people. There is no force in this position as I view it, but if so, why could not that part of the law have been declared unconstitutional and that part creating Lewis county with the county seat at Sandpoint been permitted to stand.

I am entirely satisfied that none of the provisions of the act do violence to any of the provisions of the constitution and the petition should have been granted.

ON PETITION FOR REHEARING.

(May 26, 1905.)

SULLIVAN, J.—This is an original proceeding brought in this court to test the constitutionality of a certain act of the

legislature whereby it attempted to abolish the county of Kootenai, and to create out of its territory the counties of Lewis and Clark. The case was argued at the March, 1905, Lewiston term of this court, and the court held said act unconstitutional.

A petition for rehearing has been filed herein and counsel for the defendant have filed their objections to the consideration of said petition by this court, and state three reasons therefor. The first is that this cause is an original proceeding, and that the rules of this court do not contemplate or provide for a rehearing in an original proceeding. 2. That on the twenty-seventh day of March, 1905, this court entered its decision in the above-entitled case, and the alternative writ of mandate was quashed, and that the petition for a rehearing was not filed within twenty days thereafter as required by rule 22 of the rules of this court; and 3. That the questions raised in the petition for rehearing were all argued at length when the cause was heard, and no new question is suggested by the petition.

In support of the first contention, the plaintiffs cite the decision of this court in *Washington County Abstract Co. v. Stewart, Judge,* 9 Idaho, 376, 74 Pac. 955. In that case it was held by this court "that it was not the practice in this court to consider petitions for rehearing in original proceedings, but owing to the peculiar position taken in this case, the court concluded to pass upon that application." In *Hill v. Morgan,* 9 Idaho, 718, 76 Pac. 323, a petition for a rehearing was filed, and in disposing of that petition it is said that the provisions of rule 22 of the rules of this court do not apply to cases of original jurisdiction in this court, for if they did a writ could not be issued until the time had expired for filing such petition, and thus the very purpose of the writ would often be defeated by such delay.

Under the second point above suggested, we would say that rule 22 of this court provides that all applications for rehearing shall be upon petition and shall be presented within twenty days after the judgment or order made by the court shall be placed on file, and it is contended that as the order was made in open court on March 27, 1905, the time for filing a petition for rehearing expired on April 17, 1905, and the petition

was not filed until May 1, 1905, long after the expiration of the twenty-day period.

The fact is, counsel for the petitioner were informed by some of the members of this court that they could have twenty days after the opinion in this case was filed in which to present their petition for rehearing, provided they desired to file one, and for that reason the second point made by defendant is not well taken.

The third point suggested is that all the questions suggested in the petition for rehearing were argued at length when the cause was first heard, and that no new question is suggested in the petition. That contention is correct and nothing new is suggested, except that one authority is cited that was not cited on the original hearing, which we will refer to hereafter. While it is true the rules of this court do not authorize a rehearing, or an application therefor in original proceedings in this court, yet, owing to the importance of this case, we have gone carefully through the petition and shall proceed to make a few observations on the questions suggested or raised by it.

Counsel in their petition first contend that that part of the act creating Lewis county is constitutional and may be segregated from that part of the act which abolishes Kootenai county and creates Clark county, and be permitted to stand; and contend that where a statute attempts to accomplish two or more objects and is void in one, it may still in every respect be complete and valid as to the other, and in support of that contention quotes from *Cooley's Constitutional Limitations*, fifth edition, page 209, and seventh edition, page 246, as follows: "Where, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject matter, depending upon each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed that the legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section and yet be perfectly distinct and separable so that the first may stand though the last fall. The point is not whether they are contained in the same section, for the distribution *into*

sections is purely artificial, but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself and capable of being executed in accordance with the apparent legislative intent wholly independent of that which is rejected, it must be sustained.''

We recognize the principle there laid down by Judge Cooley as a correct rule of law. The author at page 247 further states as follows: ''The difficulty is in determining whether the good and bad parts of the statute are capable of being separated within the meaning of the rule. . . . . And if they are mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the legislature intended them as a whole and if all could not be carried into effect, the legislature would not pass the residue independently, then if some parts are unconstitutional all the provisions which are thus dependent, conditional, or connected must fall with them.''

It was held in *Allen v. City of Louisiana,* 103 U. S. 80, 26 L. ed. 318, that ''where unconstitutional provisions of an act are so connected with the general scope of the law as to make it impossible, if they are stricken out, to give effect to what appears to have been the intent of the legislature, the whole law is invalid.'' And in *Redell v. Moores,* 63 Neb. 219, 93 Am. St. Rep. 431, 88 N. W. 243, 55 L. R. A. 740, that ''where it is apparent that the unconstitutional part of an act was an inducement to the adoption of the remainder, the whole act must fail.''

When measured by the well-settled rule above stated, the question arises, Can that part of the act which creates Lewis county be permitted to stand? We will here make a short analysis of the bill. The first section of said act abolishes the county of Kootenai and provides that the counties of Lewis and Clark shall be created out of the territory included within the boundary lines of said Kootenai county. Section 2 describes the boundaries of Lewis county. Section 3 describes the boundaries of Clark county. By section 4 the governor is authorized and directed, within ten days after the act shall

become a law, to appoint county officers for each of said counties, designating them; and also provides that such officers shall qualify within ten days from the date of their appointment. Section 5 establishes the county seat of Lewis county at the town of Sandpoint, and also provides that the question of the permanent location of the county seat of said county shall be submitted to the voters of said county at the next general election. Section 6 of said act establishes the county seat of Clark county at Cœur d'Alene City, and provides that the question of the permanent location of the county seat of said county shall be submitted to the voters of said county at the next general election. The seventh section provides that all of the personal property, county records, books, papers, money, credits, furniture and fixtures belonging to the former county of Kootenai shall become the property of Clark county; and further provides that after the proper officers of Clark county shall have been appointed and qualified, all such books, papers, etc., belonging to the former Kootenai county shall, by the custodian of the same, be immediately delivered to the proper officers of Clark county, and provides that the county commissioners of Clark county shall provide suitable offices within the corporate limits of Cœur d'Alene City for the accommodation of such records and the county officers of said Clark county. The eighth section provides that the indebtedness of Kootenai county at the date this act takes effect shall be apportioned between the counties of Lewis and Clark, and goes into detail of the way in which such indebtedness shall be apportioned between said counties, and also provides the manner that all property belonging to Kootenai county shall be divided between said Lewis and Clark counties. Section 9 provides for the appointment of competent accountants to ascertain the amount of indebtedness of the former Kootenai county, and directs such accountants to proceed and ascertain from the books and records of the auditor and recorder's and treasurer's offices the whole amount of the indebtedness of Kootenai county, and to compute from the assessment-roll for the year 1904, the total taxable property of each of the counties of Lewis and Clark; and directs them to make a list of all

county property and report the same in writing to the judge of the district court of the first judicial district, which judge is directed to fix the reasonable cash value of such property and apportion said indebtedness according to section 6 of said act, and to ascertain other things not necessary to mention here. Section 10 directs the recorder of Clark county within ninety days after the establishment of such counties of transcribe all matters of record from the record books of Clark county that should be recorded in Lewis county, and deliver the same to the recorder of Lewis county. Section 11 provides for a disposition of the school money in the hands of the treasurer of Clark county. Section 12 provides that said counties of Lewis and Clark shall form a part of the first judicial district of the state, and provides for the holding of terms of court in such counties. Section 13 provides that the judge of the probate court of Clark county shall proceed at once to transfer all civil and criminal actions and unsettled estates of deceased persons, and all other business required to be transferred to the probate court of Lewis county. Section 14 provides that the county commissioners of said Clark and Lewis counties shall, within five days after receiving notice of their appointment, meet at their respective county seats and organize for the transaction of county business, and shall establish precincts in their respective counties and appoint precinct officers thereof. Section 15 provides that said counties of Lewis and Clark shall constitute the thirteenth senatorial district, and that each of said counties shall elect one member of the House of Representatives. Section 16 provides that all laws of a general nature applicable to the several counties of this state and the officers thereof are made applicable to said counties. Section 17 repeals all acts and parts of acts inconsistent with said act. Section 18 declares that an emergency exists therefor, and that this act shall take effect and be in force from and after its passage and approval. Said act was approved on the twenty-eighth day of February, 1905.

From the various provisions of said act it is clear to me that all the provisions thereof in regard to the creation of Clark county, and the establishment of the county seat at

Coeur d'Alene City were the main inducement for the adoption of the remaining part of said act. The very first section of said act abolishes Kootenai county, and the abolishment of that county was, no doubt, an inducement for the passage of said act. That being true, the part of said act creating Lewis county cannot stand when tested by the rule above laid down by Judge Cooley, the supreme court of the United States and the supreme court of Nebraska.

This act is so connected and so related in substance, as I view it, as to preclude the supposition that the legislature would have created Lewis county without having created Clark. The act is so drawn and the section so constructed and the provisions so *interdependent* as to clearly indicate that the legislature intended the act to operate as a whole, and that it would not have created Lewis county alone. That being true, the entire act must be held invalid.

If you would cut out of this act all the provisions, except those applicable to Lewis county, the remaining part would be unintelligible—would, in part, at least, be a jumble of words without meaning, "sound without sense." In considering this question, I think the unconstitutional part of said act was an inducement to the legislature for a passage of the other portions. It may be insisted that this question must be determined solely by an inspection of the act itself. We concede that proposition with a slight qualification, however, which qualification is referred to in *Sibley v. Smith*, 2 Mich. 486, where the court said: "Courts are authorized to collect the intention of the legislature from the occasion and necessity of the law—from the mischief felt, and the objects and remedy in view."

The supreme court of the United States in *United States v. Union Pac. Ry. Co.*, 91 U. S. 72, 23 L. ed. 224, said: "Courts, in construing a statute, may, with propriety, recur to the history of the times when it was passed, and this is frequently necessary in order to ascertain the reason, as well as the meaning, of particular provisions in it."

In *Stout v. Grant County*, 107 Ind. 343, 8 N. E. 222, it was held that the history of a country, its topography and general

conditions, are elements which enter into the construction of the laws made to govern it, and are matters of which the court will take judicial notice, and it has been held that the general state of opinion, public, judicial and legislative, at the time of an enactment of a measure may be considered by the courts in construing it. (See *Redell v. Moores, supra,* and authorities there cited.)

It is part of the legislative history of this state that a bill was introduced in the legislature for the creation of Lewis county out of substantially the same portion of Kootenai county that the Lewis county referred to in this act contains, and that said bill failed to become a law, because of the opposition of members who afterward supported the present act. And the inducement in said act to such members was no doubt the creation of Clark county and the removal of the county seat from Rathdrum to the city of Cœur d'Alene.

Those facts are matters of common knowledge. One of the chief inducements to the passage of said act was the abolishment of Kootenai county, and the creation of Clark county with the removal of the county seat. That feature of the bill was the main inducement for its passage.

The act under consideration was approved by the governor on the twenty-eighth day of February, 1905, and contained the emergency clause, and hence became a law, if ever, on that day. As the first section abolished Kootenai county, if the act is valid, the people of that county were without county government from the twenty-eighth day of February to the seventh day of March, 1905, when the officers appointed by the governor qualified. The said act did not provide that the officers of Kootenai county should continue in office until their successors were appointed and qualified, and if the act be held valid the people of that county were without county government for a number of days. The legislature cannot deprive the people of any county of such local or self-government as the several counties of the state are entitled to under the constitution. If they can deprive a people of local government for six days, they may do so for six months or six years. The

legislature is prohibited from depriving the people of any county of local self-government.

Article 18 of our constitution, which is in regard to county organization, requires the legislature to establish a system of county governments which shall be uniform throughout the state, and prohibits the legislature from depriving the people of any county of such government. In *People v. Albertson,* 55 N. Y. 50, the court held that this right of self-government lies at the foundations of our institutions.

Section 2, of article 18, of the constitution, is as follows: "No county seat shall be removed unless upon petition of a majority of the qualified electors of the county, and unless two-thirds of the qualified electors of the county, voting on the proposition at a general election, shall vote in favor of such removal. A proposition of removal of the county seat shall not be submitted in the same county more than once in six years, except as provided by existing laws. No person shall vote at any county seat election who has not resided in the county six months, and in the precinct ninety days." By the provisions of that section, the legislature is prohibited from changing a county seat, and the people themselves are prohibited from changing it, except on a two-thirds vote of the qualified electors, and under those provisions the legislature will not be permitted to change a county seat under the guise or pretense of creating a new county. They will not be permitted to do thus indirectly what they are prohibited from doing directly. In this case, under the pretense of creating a new county the legislature has removed a county seat. They attempted to abolish Kootenai county, and attempted to create a new county out of the northern part thereof, and in the same act changed the name of the southern part of Kootenai county, and changed the county seat from Rathdrum to Cœur d'Alene City.

Judge Cooley, in his work on Constitutional Limitations, seventh edition, page 244, says: "There is no difficulty in saying that any such act, which under pretense of exercising one power is usurping another, is opposed to the constitution and void."

The case of *People v. Albertson,* 55 N. Y. 50, is a remarkable one of the intention of the legislature to avoid and evade the provisions of the constitution and still keep within its terms. I think the principle laid down there is applicable to the case at bar. It is there held that a legislative enactment evading the terms and frustrating the general and clearly expressed or necessarily implied purposes of the constitution, is as clearly void as if in express terms forbidden. And in *Taylor v. Commissioners,* 23 Ohio St. 22, the supreme court of Ohio found itself under the necessity of declaring that that which was forbidden by the constitution could no more be done indirectly than directly, which has now become a well-recognized rule of law.

Knowing the bitterness and strife engendered in county seat fights the framers of the constitution provided stringent provisions in regard to the removal of county seats, and prohibited such removal except on a two-thirds vote of the qualified electors and also prohibited the submission of such questions to the voters oftener than once in six years. Is it possible that the framers of the constitution intended to permit the legislature to change the county seats of every county in the state at each session of the legislature thereof, by simply giving the county a new name and changing the county seat under the guise and pretense of creating a new county? I think not.

Counsel for the petitioner in their original arguments in this case contend that under the provisions of the constitution, the legislature could abolish a county and create a new one out of identically the same territory and change the county seat. If that contention be true, the county seat of every county in the state could be changed as often as the legislature held a session. That certainly would leave the location of the county seat of the several counties of the state to the "mutatious whims" of the legislature, while by the terms of the constitution the people themselves are prohibited from removing their county seat oftener than once in six years. I am not in accord with that contention, and, in my view of the matter, the creation of a "new county" as contemplated by

our constitution requires something more than the change of the name of a county and the change of its county seat. Under the pretense of exercising the power to create a new county the legislature has usurped the power reserved by the people to change a county seat.

In *People v. George, supra,* in a dissenting opinion, I held that the legislature had a right to abolish a county in the creation of new counties, but upon a further investigation of this question, I am not satisfied that my views in that opinion on that point were correct. However, that case was not decided upon that point.

In addition to the cases cited on the original hearing, counsel for petitioner cited *Frost v. Pfeiffer,* 26 Colo. 338, 58 Pac. 157. That involved the constitutionality of an act of the general assembly of Colorado, creating the county of Teller out of portions of the counties of El Paso and Fremont. By that act no county was abolished and no county seat removed. The act, after creating Teller county, left the counties of El Paso and Fremont simply with reduced areas. We are unable to see wherein the decision in that case has any application whatever to the questions under consideration in the case at bar. I therefore hold that if this court had the authority under the law or its rules to grant a rehearing in a case originally brought in this court, the showing made by the petition for a rehearing in this case is not sufficient to warrant a rehearing. A rehearing is denied.

Ailshie, J., concurs.

Stockslager, C. J., dissents from the conclusion reached.